[No. 28281-6-I. Division One. May 3, 1993.]

THE STATE OF WASHINGTON, *Respondent,* v. LYNN LOUGH, *Appellant.*

---

**306**

*David Allen, Richard A. Hansen, Todd Maybrown,* and *Allen & Hansen P.S.,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Pamela Mohr, Deputy,* for respondent.

KENNEDY, J. — Lynn Lough appeals his convictions of attempted second degree rape, indecent liberties and first degree burglary and also the imposition of his exceptional sentence. His primary contention on appeal is that the trial court erred in admitting testimony of prior alleged victims as evidence of a common scheme or plan to drug and rape women. We affirm.

## FACTS

The appellant, Lynn Lough, a paramedic, met P.A., a secretary for a corporate security and fire protection department, when he was teaching an emergency medical training class to firefighters at the company where she worked. On the night of July 22, 1988, Lough and P.A. spoke on the telephone and agreed to meet at P.A.'s house to watch a rented movie. P.A. testified that she had one drink before Lough arrived, and that Lough mixed her one drink, a rum gimlet, while she made popcorn for the movie.

P.A. testified that, shortly after sipping the drink, she felt dizzy and very disoriented, and that, while she and Lough sat on the sofa together watching the movie, her head involuntarily fell on Lough's shoulder. P.A. testified that her memory was confused after this, but that she recalled her sweat pants coming down and Lough's genitals in her hands and by her face. She testified that she did not remember kissing Lough and that, when she woke up, she was nude from the waist down and Lough had gone. She testified that she found her sweat pants and underpants folded on the arm of the sofa. Although she felt groggy and dizzy, P.A. felt no soreness or tenderness in her vaginal or anal area.

Lough testified that, after he and P.A. had several drinks, all of which he said P.A. mixed, they sat down on the sofa and began watching the movie. During the movie, according to Lough, he and P.A. started kissing. He testified that he and P.A. then had consensual sexual intercourse and that P.A. was an enthusiastic participant. He testified that, after this, they both fell asleep on the sofa and that he awoke first and left P.A.'s home.

Both parties testified that Lough called P.A. the next morning. P.A. testified that Lough assured her that nothing had happened, but Lough denied this. P.A. expressed concern about the incident to friends, shortly thereafter, but did not report the matter to the police at that time. Nor did she immediately see a doctor. She did see a doctor, 2 weeks later, for a pregnancy test, which was negative.

In 1990, P.A. read a newspaper article which indicated that a King County paramedic was being investigated for drugging and raping several women. Believing that the newspaper article referred to Lough, she then contacted police and told them about the incident in July 1988. On February 9, 1990, Lough was charged with indecent liberties and attempted rape in the second degree in connection with the P.A. incident. The State thereafter filed an amended information, adding a third count charging burglary in the first degree.

Prior to the beginning of trial, Lough moved to exclude testimony concerning his alleged drugging and raping of other women. The trial court had a pretrial hearing on the matter and ruled the evidence admissible for purposes of showing a common scheme or plan to drug and sexually abuse women. Thus, at trial, testimony was presented from several persons regarding alleged prior rapes by Lough.

M.G., appellant's wife from 1977 through 1981, testified that, during a period of separation in the marriage, Lough came to her home and mixed her a drink with something in it. M.G. testified that Lough told her he had put an iron supplement in the drink. M.G. testified that, shortly after consuming the drink, she passed out. She testified that she remembered waking up, during this period of unconsciousness, because of the pain of anal intercourse. Over an objection at trial, M.G. claimed that, when she tried to call a girlfriend regarding this matter, Lough took the phone away, threw her to the floor and kicked her. Because this allegedly caused her injury, M.G. went to the hospital. No records of the hospital visit were presented at trial. M.G. testified that she did not recall whether she informed the doctor of the drugging and that, due to embarrassment, she did not inform the doctor of the anal rape. M.G. testified that she asked Lough about the rape several times, and that he first told her that no one would believe her. Later, he allegedly told her that he would not bother her if she would not report the incident. M.G. did not report this alleged incident to the police until 1989, after the police contacted her because of a similar alleged incident reported by another woman.

Lough denied that he ever drugged or anally raped M.G. He also denied ever purposefully hitting her but admitted that he might have hit her accidentally, once, when he was trying to take the telephone away from her.

D.L. testified that she and her husband used to be friends with Lough. She testified that, one evening in 1980 when she was alone with Lough at her home, he gave her a drink and that she got dizzy. She testified that Lough tried to kiss her and that she passed out and awoke, many hours later,

naked on her bed. She testified that she found the clothes she had been wearing when she passed out neatly folded on a footstool in her bedroom. She testified that, when she awoke, her anus was very sore and she was bleeding from her anus and vagina. D.L. testified that when she confronted Lough about the incident, he told her she had wanted to do it and that no one would ever believe her if she reported it. D.L. admitted on cross examination that, after the alleged incident, she and her husband moved into Lough's home and lived there for several months and that she allowed herself to be alone with Lough, in an automobile going to paramedic training classes, after the alleged incident.

Lough denied ever drugging or having sex with D.L.

K.R., Lough's second wife, testified about an incident in which Lough gave her some pain medication, which put her to sleep. She testified that she subsequently awakened to find her clothing removed and her rectum bleeding. K.R. testified that she confronted Lough about the incident and he claimed that they had had consensual anal sex. She testified that she had asked Lough for pain medication, and that she had, on this or another occasion, written a note to Lough, asking him to get some pain medication from his stepparents. K.R. testified that she was in pain, during this period of time, due to a broken arm which was slow to heal.

Lough testified that he never gave K.R. any medication without her knowledge and that he and K.R. had consensual anal intercourse two or three times.

P.U. and Lough were romantically involved from 1986 until 1989, and lived together from July 1988 through March 1989. P.U. testified that, one night in mid-September 1988, after she and Lough had consensual vaginal intercourse, Lough gave her some grape juice and she drifted off to sleep. She testified that she remembered waking up with a terrible pain and that blood was coming out of her anus. She had undergone a hysterectomy on July 20, 1988,[1] and thought

---

[1]P.U. was in the hospital for several days because of the surgery, including the day of the incident alleged by P.A.

that something could have gone wrong from the surgery. However, before she called the doctor, she testified that she noticed the grape juice glass and began to suspect that she might have been drugged. She testified that she confronted Lough after she woke up and while he was reading a book. She testified that Lough continued to read the book and gave a noncommittal response. P.U. never reported the matter to a doctor and she continued to live with Lough and to have consensual sexual intercourse with him, for several months. P.U. testified that she again confronted the appellant about this alleged incident, in March 1989. She testified that he told her at that time that it had been too long, and that no one would believe her.[2]

In an interview conducted with P.U. by Detective Hentel in March 1989, P.U. denied that Lough had forced her to have anal sex. Later, in a different interview with the police conducted in August 1989, P.U. speculated that appellant may have forced her to have anal sex. P.U. testified that she had not wished to discuss the matter with strangers and that, accordingly, she initially declined to admit what had happened.

Lough denied ever drugging or having anal intercourse with P.U.

Evidence of the effects of various drugs which allegedly could have been used by Lough on P.A. was also presented at the trial. The State's witness, Dr. Peter Roy-Byrne, testified about the effects of drugs such as Halcion[3] and Xanax. Dr.

---

[2]Before charges in the current case were filed, Lough was charged in a 4-count information with giving controlled substances to P.U. and to her daughter, with third degree attempted rape of P.U., and with communication with a minor (P.U.'s daughter, S.G.) for immoral purposes. Lough was found not guilty, in a jury trial, of three of the counts. The fourth count was dismissed with prejudice. Before charges were filed in the instant matter, Lough was also separately charged with indecent liberties upon the person of another female, one not at issue here. That case went to trial, as well, and appellant was found not guilty.

[3]Based in part upon evidence which was not allowed to go to the jury, the State believed that Lough had used Halcion on several of his alleged victims. See footnote 5.

Roy-Byrne testified that Halcion causes memory loss and that its effect will be intensified if it is taken with alcohol. He also testified that a person under the influence of Halcion can usually be aroused and that he or she more likely would remember a traumatic event occurring while he or she was under the influence of that drug, than a routine happening. Dr. Roy-Byrne also testified that Halcion has variable effects, that it can cause a hangover in conjunction with alcohol, and that a .5-milligram tablet was taken off the market, after 1988, due to a number of reports of amnesia and due to the danger of overdosage.

Dr. Lawrence Halpern testified for the defense that Halcion does not cause a hangover. He also testified that Halcion will not block pain and that, if someone were to be injured while under its influence, he or she would feel it. He also testified that Halcion, although it does not alter normal behavior, may cause a person not to remember what his or her behavior was. Dr. Halpern testified that Halcion is not soluble in water, although it is soluble in alcohol.

Dr. Halpern also testified that he conducted an experiment using tequila and water and determined that Halcion could not be completely dissolved in that mixture. He also testified that a few sips of a drink containing a .5-milligram dose of Halcion would not cause a person to pass out immediately.

With regard to the evidence of other crimes, the trial court instructed the jury as follows:

> Evidence has been introduced of allegations that have not been charged in this case. Evidence of these other allegations or acts has not been admitted, and cannot be considered, to prove the character of the defendant in order to show that he acted in conformity therewith. The evidence may be only considered to determine whether or not it proves a common scheme or plan.
>
> A common scheme or plan refers to a larger criminal design of which the charged crime is only one part. For there to be a common scheme or plan it must be shown that there is an overarching design or plan which [evidentially] points to the doing of the act planned. Something more than the doing of similar acts is required in evidencing design, such as proving the existence of a definite project directed towards completion of the crime in question.

This evidence cannot be considered by you, to prove propensity, proclivity, predisposition or inclination to commit rape or to administer drugs surreptitiously.

If you do not find that evidence of these other uncharged allegations proves a common scheme or plan, as defined herein, you shall disregard such evidence completely.[4]

The jury returned a verdict of guilty on all counts on December 5, 1990. Lough was sentenced to an exceptional sentence of 60 months in prison. This appeal followed.

DISCUSSION

I

Admission of ER 404(b) Evidence

Lough contends that his convictions must be reversed because the trial court erred in admitting the testimony of other alleged rape victims for purposes of establishing a common scheme or plan to commit the prior crimes and the present offenses. ER 404(b) provides that:

[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

■■■ The admission of evidence under ER 404(b) is also subject to the limitations of ER 402 and ER 403 as to relevance and prejudice. Thus, even if evidence of prior crimes falls under one of the exceptions recognized in ER 404(b), it should not be admitted if the prejudice clearly outweighs the probative value. *State v. Goebel*, 40 Wn.2d 18, 23, 240 P.2d 251 (1952); *State v. Bacotgarcia*, 59 Wn. App. 815, 819, 801 P.2d 993 (1990), *review denied*, 116 Wn.2d 1020 (1991). The purpose of ER 404(b) is to prohibit the introduction of evidence which could lead a jury to determine that a defendant committed the crime with which he or she is charged simply because he or she committed a similar crime in the past.

---

[4]This instruction was read to the jury immediately before each ER 404(b) witness testified, and again at the end of the testimony when all of the other instructions were read.

However, in recognition that evidence of prior crimes may be particularly relevant to certain specific issues, such as proof of motive, intent or identity, ER 404(b) allows its admittance if its probative value outweighs its prejudice. *See* 1 J. Strong, *McCormick on Evidence* § 190, at 798 (4th ed. 1992) (hereinafter McCormick).

In determining whether evidence of other crimes may be admitted under ER 404(b), a trial court must conduct the following analysis on the record: (1) identify the purpose for which the evidence is to be admitted; (2) determine that the evidence is relevant and of consequence to the outcome; and (3) balance the probative value of the evidence against its potential prejudicial effect. *State v. Smith*, 106 Wn.2d 772, 776, 725 P.2d 951 (1986). ER 404(b) rulings are to be reviewed under an abuse of discretion standard. *Bacotgarcia*, 59 Wn. App. at 824.[5]

In the present case, the trial court conducted its analysis on the record and determined that the evidence could be admitted to show a common scheme or plan:

> [THE COURT:] [T]he Court is guided by *State versus Smith* at 106 Wn. 2d 772, [725 P.2d 951 (1986),] which reviews many of the other cases in the State of Washington on this subject, and it provides generally three criteria for analyzing this issue.
>
> One, what is the purpose of the offer? Two, is it relevant? And under that, A, is it — is the evidence of consequence?

---

[5]Lough contends that an abuse of discretion standard is inappropriate, since the trial court here was presented with a question of "law" without having to examine issues of witness credibility. Lough complains that reviewing this issue under an abuse of discretion standard would mean that the trial court could apply the law incorrectly, without adequate appellate review, in possible violation of constitutional law.

The case law is clear that an abuse of discretion standard governs in the instant case, and we note that, when reviewing a question of "law", if an appellate court determines that the trial court applied the law incorrectly, then it abused its discretion, and its decision will be overturned. As stated in the official comment to ER 404(b), the discretion conferred upon the trial judge is not arbitrary. The discretion is to be used with great caution to avoid prejudicing defendants. ER 404 comment. The admission of evidence in violation of ER 404(b) does not raise an issue of constitutional magnitude. *Dowling v. United States*, 493 U.S. 342, 107 L. Ed. 2d 708, 110 S. Ct. 668 (1990); *see also State v. Cameron*, 47 Wn. App. 878, 886, 737 P.2d 688 (1987).

And, B, would it add to the effect that the fact intended to be proved is more probably true than not? And, three, in balancing what is the prejudicial effect, vis-a-vis the probative value of the evidence. In this particular case, the purpose is not modus operandi, because the incidents are not so similar and peculiar in nature as to be like a signature, not so distinctive that the separate incidents are recognizable as the handiwork by one person as their [*sic*] characteristic signature.

Rather, the offer is for the purpose of providing evidence in this case of common scheme or plan, i.e., a larger criminal design of which the charged crime is only one part. There must be enough specific and unique features in common between the offenses to show that the plan or scheme was carried out by committing the charged offense. Proof of the other incidents must be evidence of a pre-existing design, system, plan, or scheme directed toward the doing of the very act charged. In the instant case, the common scheme or plan is the overarching, pre-existing scheme or plan as follows[:] . . .

The control of women by rendering them unconscious by the surreptitious use of drugs for the purpose of abusing them sexually. By surreptitious, I mean not only unknown to the women in question but also if known that there were drugs involved, the dosage was not known.

. . . .

Here, in this case, it appears to the Court that there is more than [mere] similarity [of crimes]. There is an over-arching plan or scheme, as presented by the . . . proposed evidence. And that scheme is drugging women for sexual abuse, and the offense charged is a manifestation of the plan. And, therefore, the other incidents are causally connected and provide circumstantial evidence that the offense charged is true. Thus, the evidence of the other incidents [is] relevant under Evidence Rule 401 in that the evidence has a tendency to make the existence of the truth of the charge more probable than it would be without the evidence.

Also, it is of consequence to the outcome of the action. The testimony of [P.A.] standing alone is more vulnerable to attack without the common plan evidence. She is the only witness, and her recall is vague and hazy, which could be assailed as resulting from drinking, falling asleep, manufactured or exaggerated. In addition, she did not report the incident until months later. Certainly the evidence of other similar incidents within the overarching common plan or scheme is circumstantial and corroborating evidence in support of her testimony, especially considering evidence that the defendant [is] a paramedic with some medical knowledge and training . . ..

. . . .
Now, balancing and considering the prejudicial effect, I have indicated the probative value of the evidence, and there is obviously some prejudice to the defendant, which I believe is necessary. I will only allow, however, evidence that is clearly within the common plan; that is, drugging and sexual assault.[6]

## II·
## Common Scheme or Plan Exception

■ In order for evidence of other crimes to be admitted under ER 404(b) to prove a common scheme or plan, "the proponent of the evidence must demonstrate a specific prior design or system which included committing the act charged." *Bacotgarcia*, 59 Wn. App. at 820. Mere similarity between the offenses is not enough; there must be some causal connection between them, *Bacotgarcia*, 59 Wn. App. at 820, "so that proof of the other offense could be said to evidence a pre-existing design, system, plan, or scheme directed toward the doing of the very act charged." (Citation omitted.) *Goebel*, 40 Wn.2d at 21.

As stated in McCormick § 190, at 800-01: "[e]ach crime should be an integral part of an over-arching plan explicitly

---

[6]Thereafter, the trial court ruled that evidence of several episodes of alleged sexual misconduct not at issue here would not be admissible. The court determined that, while these additional alleged crimes might tend to show a predisposition toward committing sexual crimes, these other alleged crimes were either not within the common scheme or plan, or, if so, the prejudice outweighed the probative value. For example, the court specifically excluded evidence that Lough offered 15-year-old S.G. Halcion in a glass of iced tea, and that he offered her two Halcion tablets which S.G. did not ingest, determining that S.G.'s age would add to the prejudicial effect of the evidence and that ·whether Lough would have sexually abused S.G., had she taken the drug, was somewhat speculative; and further that, by virtue of sheer numbers, there could be an additional undue prejudicial effect. Evidence that Lough also offered four mild sleeping pills to a 12-year-old girl, who took only two of them, was excluded for similar reasons.

This excluded evidence, although it was kept from the jury in the sound discretion of the trial court, is the type of evidence which a court may properly consider in determining whether to submit the issue of a common scheme or plan to a jury. *See* ER 104. *See also* Comment, *Admission of Evidence of Other Misconduct in Washington To Prove Intent or Absence of Mistake or Accident: The Logical Inconsistencies of Evidence Rule 404(b)*, 61 Wash. L. Rev. 1213, 1229 n.1 (1986), fully cited and discussed *infra*.

conceived and executed by the defendant or his confederates." As explained by Wigmore, evidence of a common scheme or plan must be much more than mere similarity between crimes which can be admissible to show intent, motive or absence of mistake.

> When the very doing of the act charged is still to be proved, one of the evidential facts receivable is the person's design or plan to do it. This in turn may be evidenced by conduct of sundry sorts as well as by direct assertions of the design. But where the conduct offered consists merely in the doing of other similar acts, it is obvious that something more is required than that mere similarity, which suffices for evidencing intent. The object here is not merely to negative an innocent intent at the time of the act charged, but to prove a preexisting design, system, plan, or scheme, directed forwards to the doing of that act.

(Citations omitted.) 2 J. Wigmore, *Evidence* § 304, at 249 (1979) (hereinafter Wigmore).

Citing, *inter alia, State v. Downer*, 68 Wash. 672, 123 P. 1073 (1912), it is stated in 29 Am. Jur. 2d *Evidence* § 326, at 377 (1967), that:

> [t]he law permits proof of a plan or scheme to commit a series of crimes including the one for which the accused is being tried, and, as tending to show the existence of such plan or scheme, it allows testimony of the commission of crimes other than the one charged, but so related in character, time, and place of commission as to tend to support the conclusion that there was a plan or system which embraced both them and the crime which is charged.[7]

We find from our examination of the cases cited in the various treatises on this subject that there are two categories or types of cases in which the courts have found the evidence at issue to be sufficient to demonstrate a common

---

[7]In *State v. Downer*, 68 Wash. at 673-74, our Supreme Court affirmed the trial court's admission of evidence of other uncharged crimes tending to show that a bookkeeper had an ongoing scheme to embezzle funds from his employer. The evidence was offered to rebut the bookkeeper's defense that, although he had "borrowed" money from the employer's cash drawer, he had later paid it back. Although *Downer* predates Washington's adoption of ER 404, the official comment to the rule states that it and Federal Rule 404 "conform[] substantially to previous Washington law." ER 404 comment.

scheme or plan. The first category causes relatively little difficulty. It includes cases such as the following: *Lewis v. United States*, 771 F.2d 454 (10th Cir.) (testimony properly admitted that defendant accused of burglary of a post office first burglarized a garage to obtain a cutting torch which he then used in the post office burglary), *cert. denied*, 474 U.S. 1024, 88 L. Ed. 2d 562, 106 S. Ct. 579 (1985); *State v. Yoshino*, 45 Hawaii 206, 364 P.2d 638 (1961) (evidence of first robbery admissible in prosecution for second robbery where defendant and others robbed first victim and obtained from him the name and address of their second victim). See also other similar cases cited in McCormick § 190, at 800 n.15. In these examples the causal connection between the crimes at issue is so clear as to leave little room for debate.

The second category of cases causes a great deal of difficulty and we find much difference of judicial opinion reflected in the various decisions. The question of admissibility in this line of cases appears to turn upon whether a given court believes the evidence at issue tends to show that the defendant *planned* to commit a series of crimes, including the specific crime being tried, or whether the evidence merely tends to show that the defendant committed two or more crimes which happen to be of a similar nature. In this latter type of case, the evidence may merely tend to show a proclivity toward committing crimes of a particular nature, leading only to the very conclusion which is forbidden by the law, namely, once a thief, always a thief; once a rapist, always a rapist; once a bank robber, always a bank robber. *See, e.g., United States v. O'Connor*, 580 F.2d 38 (2d Cir. 1978) (bribes 6 months earlier not sufficiently probative of a definite plan directed toward completion of crime being tried) and other cases cited in McCormick § 190, at 801 n.18. Compare *State v. Morowitz*, 200 Conn. 440, 512 A.2d 175 (1986) (sedation of and sexual assault upon young female patient 3 years earlier sufficiently similar to case being tried to be probative of a common scheme or plan by podiatrist to sedate and sexually assault young female patients).

Our own Washington case law reflects a similar range of judicial disagreement, with respect to this second category of cases. *Compare Goebel*, 40 Wn.2d at 22 (fact that the defendant may have raped a woman in his truck on March 29, 1949, did not tend to establish a plan to rape another woman in his truck later that same day, much less a design or plan to rape a third woman on February 8, 1949) *with State v. Bennett*, 36 Wn. App. 176, 672 P.2d 772 (1983) (evidence that the defendant previously gave food, shelter and medical care to a runaway street child in exchange for sex could be used as evidence of a common scheme or plan to provide food, shelter and medical care to runaway street children in exchange for sex, at a trial charging a similar crime). *Compare also State v. Bowen*, 48 Wn. App. 187, 738 P.2d 316 (1987) (fact that doctor made house calls to two female patients whom he knew to be separated from their husbands and fondled their breasts not evidence of a common scheme or plan to make house call to and fondle the breasts of a third woman, the complaining witness in the case being tried, whom the doctor also knew to be separated from her husband) *with Bacotgarcia*, 59 Wn. App. at 823-24 (trial court did not abuse its discretion in admitting evidence that defendant gave drugs to a young girl in exchange for sex to show a common scheme or plan to entrap another girl in prostitution through the use of drugs). *And compare State v. Lynch*, 58 Wn. App. 83, 792 P.2d 167 (the robbing of first grocery store while wearing a specific disguise, brandishing a specific gun and making a getaway on a specific bicycle was admissible to show modus operandi and, therefore, identity, but was not admissible as tending to show a common scheme or plan to rob a second store while wearing the same disguise, brandishing the same gun and making a getaway on the same bicycle), *review denied*, 115 Wn.2d 1020 (1990) *with State v. York*, 50 Wn. App. 446, 749 P.2d 683 (1987) (not error to deny severance of trials where defendant charged with two counts of second degree rape, one count of attempted second degree rape and one count of indecent liberties; all the victims were young scholarship

students at defendant's beauty school and three of the four were accosted in a remote area of the school where detection was not likely; held that evidence of the rapes and attempted rape would have been admissible in separate trials as tending to show common scheme or plan to rape young scholarship students at the school, all of whom would have had great financial difficulty attending school without scholarships), *review denied*, 110 Wn.2d 1009 (1988).

■ In distinguishing the kind of evidence which tends to show a common scheme or plan to commit a series of crimes from that evidence which merely evidences a proclivity to steal, or rob or rape at any given time that an opportunity may present itself to do so, we glean from the case law that it is appropriate to view the evidence of similar crimes with a number of commonsense questions in mind: (1) Are the crimes at issue of the sort that necessarily would require a relatively high degree of preplanning? If so, will the planning which served the defendant well at an earlier time suffice for the execution of a later crime? (2) Is there evidence of a concentrated, repetitive effort to orchestrate events so as to reduce or preclude the likelihood of detection and/or successful prosecution? If so, is it logical to conclude that these orchestrations may be part of a systematic scheme or design?[8] (3) Is there evidence that the defendant repetitively utilized a particular skill or an unusual technique?[9] (4) Are there sufficient fea-

---

[8]*See, e.g., People v. Oliphant*, 399 Mich. 472, 250 N.W.2d 443 (1976) (evidence of three prior similar rapes admissible to show common scheme or plan to commit rape at issue and to orchestrate events so as to make it difficult to show nonconsent; evidence relevant and material to rebut defense of consent).

[9]Such evidence, when relied upon to establish identity, must be so unusual and so distinctive as to "be like a signature". McCormick § 190, at 803. The modus operandi and common plan exceptions are two distinctive concepts. The circumstances of a series of crimes may be sufficiently similar as to be probative of a common design or plan to commit all of them, although not sufficiently similar to be probative of identity. Wigmore illustrates this principle by quoting from Lindley, J., in *Blake v. Albion Life Assur. Co.*, 4 C.P. 94, 166 (1878):

I agree that in order to prove that A has committed a fraud on B, it is neither sufficient nor even relevant to prove that A has committed fraud upon C, D,

tures in common from which a rational trier of fact could determine that the other crimes at issue and the one being tried are all of the same class and, accordingly, are the work of a single mastermind of a common scheme?

This list of questions is not meant to be exhaustive, but is merely illustrative of the sort of inquiry that appears to underlie the decisions of most of those courts which have allowed evidence of other, similar crimes as tending to show the existence of a common scheme or plan to commit a series of crimes having features in common and to distinguish the decisions of most of those courts which have disallowed such evidence.

Turning now to the case of Lough and P.A. and the ER 404(b) and direct evidence at issue here, we view the evidence with these same questions in mind. First, each of the crimes at issue would, if true, necessarily require a relatively high degree of individual preplanning and the planning which went into the first such crime would be extremely useful with respect to the accomplishment of the subsequent crimes. Second, if Lough in fact devised a scheme to drug and rape women who knew him well, if he was to avoid prosecution it was necessary for him to orchestrate events so as to reduce or preclude the likelihood of detection and/or successful prosecution. Until P.A., the women involved were very close to Lough. Two of them were married to him; a third was the wife of a good friend; a fourth was his long-term companion in a relationship akin to marriage. The fifth, P.A., although only a business and social acquaintance, knew Lough well and the two had at least one friend in common. The utilization of a drug which, alone or in combination with other drugs and/or

and E. Stopping there, I admit that proposition. But let it be shown that the fraud on B is one of a class of other transactions having common features, then I disagree altogether with that proposition. . . . The answer to the objection that evidence of frauds on other persons cannot be admitted is that this transaction is one of a class, that there are features in common, the features in common being a false pretense and a knowledge of that false pretense on the part of [A]; and the moment that is shown [B's] case is established.
Wigmore § 304, at 250.

with alcohol, is well known from the medical literature to produce amnesia, is well suited to the alleged scheme and design here at issue. Third, the alleged crimes were purportedly committed by a paramedic, one sufficiently skilled to teach others the techniques of emergency medical care and one who purportedly utilized his specialized knowledge and skill to locate and administer a drug or a combination of drugs which, particularly in combination with alcohol, would render his victims physically helpless and partially or wholly amnesic. Finally, and although there are some notable differences between the anal rapes described by M.G., D.L., K.R. and P.U. and the testimony of P.A., who did not know whether she had been raped at all, the crimes at issue here are of the same class. They all involved the purported drugging of women whom Lough knew well for the alleged purpose of sexual activity which each of these women testified she had not consented to and would not have engaged in voluntarily, had she been given the freedom of choice. We believe that a rational trier of fact could conclude, on the basis of the evidence here presented, that Lough was the mastermind of an overarching plan to utilize his specialized knowledge and skill for the purpose of drugging and sexually assaulting women who knew and trusted him, by the use of a drug or drugs which, particularly when used in combination with alcohol, would likely render his victims somnolent and wholly or partially amnesic.

█ This conclusion is supported by the so-called "doctrine of chances". This doctrine may properly play a role in the determination by a trial or appellate court that the common scheme, design or plan exception may be applied in a given case.

> The doctrine of chances is based entirely on probabilities. Its foundation is the instinctive recognition that the odds against an innocent person being repeatedly involved in similar suspicious circumstances increase with each incident. At some point of recurrence, the similar repeated acts can no longer be viewed as coincidental. When the evidence reaches such a point, the recurrence of a similar unlawful act tends to negate accident,

inadvertence, good faith, or other innocent mental states, and tends to establish by negative inference the presence of criminal intent.

(Footnote omitted.) Comment, *Admission of Evidence of Other Misconduct in Washington To Prove Intent or Absence of Mistake or Accident: The Logical Inconsistencies of Evidence Rule 404(b)*, 61 Wash. L. Rev. 1213, 1225-26 (1986). *See also* Wigmore § 302, at 241.

Although the doctrine of chances is most often invoked when intent or absence of mistake are in issue, the doctrine underlies several of the ER 404(b) exceptions, including modus operandi, *see* Comment, 61 Wash. L. Rev. at 1233, and common scheme or plan, *see* Wigmore § 240, at 42 (acts which, standing alone, may carry no suggestion of design or plan, may, when multiplied or when compared with other acts or circumstances, suggest a common plan); Wigmore § 304, at 250-51 (difference between that similarity of crimes sufficient to negate criminal intent and that similarity which includes sufficient common features to indicate a common design is a difference of degree rather than of kind).[10] A criminal design, scheme or plan most often must be proved by conduct and logical inference, for rarely will there be express declarations by a defendant directly evidencing such plan. Wigmore § 304, at 250. Repetition and commonality of features, until a threshold of improbability is reached, are irrelevant, for they may be based on coincidence or they may tend to establish only propensity — the forbidden inference by which a defendant may be deprived of his or her right to a fair trial. It is the task of the trial court, subject to appellate review, to make the threshold determination: has there been sufficient repetition and are there a sufficient number of common features and are those common features themselves of sufficient complexity to lead to a logical inference that all of the acts in issue, including the acts being tried, if done, are

---

[10]An even higher degree of similarity is required to establish identity. The method employed "must be so unusual and distinctive as to be like a signature." *State v. Coe*, 101 Wn.2d 772, 777, 684 P.2d 668 (1984) (quoting E. Cleary, *McCormick on Evidence* § 190, at 449 (2d ed. 1972)); *see also* McCormick § 190, at 803.

but separate manifestations of the same overarching plan, scheme or design?

The trial court's ruling in the instant case passes the test of the law of chances. If Lough in fact drugged and sexually assaulted the women who say he did, in the manner they say he did, using a drug which would render his victims somnolent and partially or wholly amnesic, the probability that he had an overarching criminal design to drug and sexually assault women in just this manner and with just this result is exceedingly high. In truth, we deem it highly improbable that such a series of crimes could be conceived of and carried out over a period of more than 10 years, and with such a degree of success as here evidenced, in the absence of such an overarching plan.

Clearly, the evidence here does not meet the test of what we have described as the first category of cases contained in the treatises — those cases in which the causal connection between crime A and crime B is so simple and clear as to leave little or no room for debate. Just as clearly, the evidence here does meet the test by which the better reasoned of the second category of cases have been decided, those cases in which the crimes at issue may not form part of one single "transaction" but which, nevertheless, are sufficiently connected with each other by way of common features so that men and women of good faith and common reasoning can logically discern them to be the handiwork of a single mastermind and the result of a common scheme, plan or criminal design. We have no doubt that multiple victims may fall prey to such an overarching scheme, and that such a scheme may work successfully for many years. That such a scheme may prove to be successful for a period of many years tends to support the theory that, in fact, there was just such a scheme in operation. A poorly conceived and largely unplanned series of crimes is likely to fail, early on. A well planned scheme is likely to be successful for a longer period.

In Wigmore § 357, at 334-42, referring to common schemes, designs or plans to commit rape, it is stated:

The *design* or *plan* principle requires that the former act or acts should indicate, by common features, a plan or design which tends to show that it was carried out by doing the act charged. . . .

. . . .

. . . [A] single previous act, even upon another woman, *may*, with other circumstances, give strong indication of a design (not a disposition) to rape; . . .

Courts have shown altogether too much hesitation in receiving such evidence. Even when rigorously excluded from any bearing it may have upon character, it may carry with it great significance as to a specific design or plan of rape. There is no reason why it should not be received when it does convey to the mind, according to the ordinary logical instincts, a clear indication of such a design. There is room for much more common sense than appears in the majority of the rulings.

(Footnote and citations omitted.) We agree.

We hold that the trial court did not err in determining that a reasonable trier of fact could, on the basis of the evidence here at issue, determine that Lough was the mastermind of an overarching plan, scheme or design to drug and sexually abuse a series of women, including M.G., D.L., K.R., P.U. and P.A.[11]

### III

### Relevancy and of Consequence to Outcome

Our review of the trial court's determination that the evidence here at issue tended to demonstrate a common scheme or plan to drug and rape women does not end the inquiry. The next question is, if there was such a plan, so what? Is the existence of such a plan relevant to any material issue? If so, to what issue? We have noted the trial court's rationale and do not disagree. However, we believe that, in order for our reasoning to be of any significant aid to these parties and

---

[11]Although the jury was not allowed to hear the evidence relating to Lough's alleged attempts to drug S.G. and the 12-year-old girl, the trial judge could properly consider whether these recent manifestations of the alleged plan increased the likelihood that there was, indeed, a common scheme, plan or design in operation here. ER 104. *See also* 29 Am. Jur. 2d *Evidence* § 326, at 377 (1967) (Crimes related in terms of character, time and place of commission may tend to support conclusion of common scheme or plan.).

to others who may review our decision for any purpose what-soever, additional explanation is required.[12]

We thus turn to the specific charges here at issue, to the contested elements thereof, and to Lough's affirmative defense that P.A. consented.

A. Indecent Liberties.

Lough was charged with violation of RCW 9A.44.100(1)(b), which provides that a person is guilty of indecent liberties when he "knowingly causes another person who is not his spouse to have sexual contact with him . . . [w]hen the other person is incapable of consent by reason of being . . . physically helpless".[13] In order to be guilty of indecent liberties upon an adult nonspouse in violation of RCW 9A.44.100-(1)(b), a defendant must knowingly cause "sexual contact" *and* he must "knowingly" cause such contact with a person who is "physically helpless".[14]

"Knowingly" is defined by law, and was defined for the jury which heard this trial, as follows: a person acts "know-ingly . . . when he or she is aware of a fact, facts, circum-stances or result described by law as being a crime." Instruc-tion 7; Clerk's Papers, at 30; *see also* RCW 9A.08.010(1)(b)(i).

The State's theory was that Lough knew P.A. was physi-cally helpless, and therefore incapable of consent, because he

---

[12]This court requested and received supplemental briefing from the parties on the issues hereafter discussed.

[13]For purposes of RCW 9A.44, " '[s]exual contact' means any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party." RCW 9A.44.010(2). Lough admitted knowingly causing "sexual contact" with P.A. as defined by law. He did not admit knowingly doing so while P.A. was physically helpless.

" 'Physically helpless' means a person who is unconscious or for any other reason is physically unable to communicate unwillingness to an act." RCW 9A.44.010(5).

[14]That "knowingly" modifies both "causes another person . . . to have sexual contact" and "when the other person is . . . physically helpless" is apparent from the sentence structure and punctuation of the statute. It is also apparent from RCW 9A.44.030(1) which allows a defendant to negate culpability by interposing the affirmative defense that he reasonably believed the victim was not physically helpless.

drugged her drink for that exact purpose. Lough denied drugging P.A.'s drink, denied that she was physically helpless for that or any other reason, and affirmatively alleged that P.A. consented.[15]

The two crucial elements which the State was required to prove beyond a reasonable doubt were (1) P.A. lacked capacity to consent by reason of being physically helpless; and (2) Lough knew it, and had sexual contact with her, notwithstanding such knowledge.[16]

■ Lough's admission of "sexual contact" with P.A. does not remove the "knowledge" element from issue in this case. Lough argues that it does, relying upon *State v. Ramirez*, 46 Wn. App. 223, 730 P.2d 98 (1986), in which Division Two of this court stated that evidence of one child fondling incident would not be admissible in a case alleging indecent liberties with another child in order to prove criminal intent. In *Ramirez* the court stated that criminal intent was not at issue because it flowed from the act of touching for sexual gratification itself.

We agree that guilty knowledge and criminal intent would always be present in cases involving admitted touching of a child for purposes of sexual gratification. A child is legally incapable of giving such consent. But here, the alleged victim was an adult of normal mental capacity whose inability to give consent was based upon a claim of deliberate drug-induced physical helplessness. Therefore, Lough's admission of sexual touching removes no other critical element from the case. The State was still required to prove that P.A. lacked capacity to consent and that Lough knew this to be so.[17]

---

[15]Lough testified that P.A. had several drinks that evening and that, as a result, she was "happy", but certainly not unconscious.

[16]Lough's defense of consent is an affirmative defense as to which he carried the burden of persuasion. The State retained the overall burden of proof and persuasion of guilt beyond a reasonable doubt. *See State v. Camara*, 113 Wn.2d 631, 781 P.2d 483 (1989).

[17]The "knowledge" element of indecent liberties, under the circumstances of this case, appears to provide an independent basis for the admission of the ER

There can be no question that, if Lough had a criminal scheme, plan and design to drug and rape women and to escape punishment by the use of a drug which would render his victims partially or wholly amnesic, the State's theory that P.A. was one of several victims of such scheme is highly relevant and of great consequence to the crucial elements here at issue: P.A.'s lack of capacity to consent, and Lough's guilty knowledge of that fact. Moreover, as pointed out by the trial judge, P.A.'s recollection of the events of that evening was hazy at best. She described the events she could recall as being dreamlike. She was uncertain whether she had been raped, although she recalled enough to support a charge of indecent liberties, if the jury were to believe that she recalled actual events and not a dream. If she was drugged that evening with Halcion the credibility of her testimony is greatly enhanced, for her partially amnesic state is fully explained.

B. Attempted Second Degree Rape.

Lough was also charged with attempted second degree rape,[18] in violation of RCW 9A.44.050(1)(b) and RCW 9A.28-.020. A person is guilty of rape in the second degree if he "engages in sexual intercourse with another person . . . [w]hen the victim is incapable of consent by reason of being physically helpless". RCW 9A.44.050(1)(b). A person is guilty of attempted second degree rape if, with intent to commit

---

404(b) evidence here at issue. Even absent sufficient evidence to show a common scheme or plan to drug and sexually abuse a series of women, P.A. among them, we believe the State could properly have presented the same evidence to show that Lough knew P.A. was rendered physically helpless and partially amnesic by the drug he gave her, because he had successfully rendered women unconscious and partially amnesic by the same method a number of times before. Although Lough's defense was not that he reasonably believed P.A. not to be physically helpless, but rather, that she was not physically helpless because he did not drug her, the State nevertheless was required to prove beyond a reasonable doubt that Lough knew P.A. was physically helpless, and knowing that to be so, that he had sexual contact with her.

[18]In his supplemental briefing, Lough argues that the indecent liberties charge was identical to the attempted second degree rape charge and that, therefore, the indecent liberties charge should have been dismissed. This issue was not raised below and it was not originally argued in the appeal. Accordingly, we decline to address the issue.

that specific crime, he does any act which is a substantial step toward the commission of that crime. RCW 9A.28-.020(1).[19] It is an affirmative defense to the crime of second degree rape if an alleged victim who is capable of consent did consent. " 'Consent' means that at the time of the act of sexual intercourse there are actual words or conduct indicating freely given agreement to have sexual intercourse." RCW 9A.44.010(7). The essential elements of attempted second degree rape of a physically helpless person are (1) doing an act which is a substantial step toward engaging in sexual intercourse with another person when the victim is incapable of consent by reason of being physically helpless; (2) with intent to engage in sexual intercourse with that person when he or she is incapable of consent by reason of being physically helpless.[20]

By admitting sexual intercourse with P.A. during his opening statement at the commencement of trial, and by his subsequent testimony at trial, Lough removed from material dispute the "substantial step" and "intent to engage in sexual intercourse" elements, leaving as the crucial disputed issue the question of whether P.A. was incapable of consent by reason of being physically helpless. The State's theory was that P.A. was incapable of consent because Lough deliberately drugged her into unconsciousness. Lough's defense was that he did no such thing. In addition Lough claimed that P.A., who he said was "happy" from the drinks she had, but by no means unconscious, consented to sexual intercourse.

---

[19]Although P.A. was not certain she had sexual intercourse with Lough, Lough stated at trial that she did. A person may be convicted of an attempt to commit a crime, even though the evidence at trial establishes that the crime was actually completed. See State v. Rowe, 60 Wn.2d 797, 376 P.2d 446 (1962).

[20]As is true with indecent liberties, a defendant may negate criminal culpability for second degree rape as here defined by showing that he reasonably believed the victim was not mentally helpless. RCW 9A.44.030(1). "Knowledge" is not a statutory element of second degree rape as it is of indecent liberties. Clearly, however, the Legislature has recognized that criminal culpability for second degree rape of a physically helpless person may be negated on the basis of a lack of guilty knowledge with respect to physical helplessness.

In the peculiar circumstances of this trial, Lough's "she consented" defense, while clearly of some psychological benefit in his effort to persuade the jury, was *legally and logically* superfluous. The State's *sole* theory as to P.A.'s incapacity to consent was that Lough deliberately drugged P.A. into unconsciousness, rendering her legally incapable of giving consent. In this context, that is, if the State's evidence were to be proved beyond a reasonable doubt, consent is no defense at all. The only real issue for the jury was, was P.A. incapable of consent because Lough deliberately drugged her? If the jury had believed that Lough did *not* drug P.A., the State had no other theory to fall back on. There was no issue of forcible compulsion. The State did not claim that P.A. was incapable of consent by virtue of voluntary intoxication. In this context, if P.A. was not drugged into unconsciousness, there was no theory upon which Lough could have been convicted.

Thus, the State's theory that P.A. was but one of a class of victims falling prey to Lough's alleged plan, scheme and criminal design to drug and rape women was a crucial part of its case.

Lough argues that this is not so, relying in large part upon *State v. Saltarelli*, 98 Wn.2d 358, 655 P.2d 697 (1982). In *Saltarelli*, a divided Supreme Court ruled that evidence of a forcible rape allegedly committed some 5 years earlier could not be admitted to show motive or intent in a trial for second degree rape by forcible compulsion. The defendant in *Saltarelli* admitted sexual intercourse but alleged that the "victim" had consented. The *Saltarelli* majority reasoned that motive or intent was of no consequence because "when the fact of intercourse is admitted by defendant . . . the only issue is whether the victim consented." *Saltarelli*, 98 Wn.2d at 363. Because evidence of a common scheme or plan is usually relevant in order to establish motive, identity or intent, McCormick § 190, at 801, and because identity is not here at issue, and because Lough admitted sexual intercourse with P.A., he argues that *Saltarelli* stands for the

proposition that there is no issue here as to which the evidence of a common scheme or plan is relevant and material.

■ We disagree. Unlike *Saltarelli*, Lough's admission of sexual intercourse with P.A. did not remove from issue the question of whether P.A. was incapable of consent by reason of being deliberately drugged into a state of physical helplessness by the very person who allegedly raped (attempted to rape) her.

In *Saltarelli*, the court said that it was by no means clear how an assault on a woman could be a motive or an inducement for defendant's rape of a different woman 5 years later and that evidence of the earlier assault should not have been admitted to show motive, even if there were some probative value because, where the only issue is consent, defendant's motive is irrelevant. *Saltarelli*, 98 Wn.2d at 365. Here, by way of contrast, the question is whether Lough was "motivated" to drug P.A. for the criminal purpose of raping her. Evidence that Lough drugged four other women for the criminal purpose of raping them is of significant probative value, so long as that evidence is sufficient to show a common scheme or plan to drug and rape all the women at issue, including P.A. Lough's defense that P.A. consented to sexual intercourse, if believed, would negate his motive to drug and rape P.A., but it does not render his alleged motive irrelevant. Nor does it render his alleged criminal design irrelevant, P.A. being one of the alleged victims of that very plan.

The *Saltarelli* court also stated that evidence of the earlier assault should not have been admitted to show intent because, the defendant having admitted sexual intercourse, intent was not in issue. *Saltarelli*, 98 Wn.2d at 365-66. Here, by way of contrast, to admit sexual intercourse with P.A., allegedly with her consent, was not to admit deliberately drugging P.A. thus rendering her incapable of consent. The criminal intent behind a common scheme, plan or design to drug and rape women is not obviated by a defendant's claim that he did not drug this or any other alleged victim of the scheme and that this and all his other victims consented.

As the *Saltarelli* court recognized by its citation to and quotation from *People v. Kelley*, 66 Cal. 2d 232, 242-43, 424 P.2d 947, 57 Cal. Rptr. 363 (1967), even where a defendant does not specifically raise the issue of intent or good faith, evidence of other offenses may be admissible as showing a common scheme or plan. *See Saltarelli*, 98 Wn.2d at 366. We hold that *Saltarelli* does not bar the evidence of common scheme which is here at issue. That evidence is probative of the issue of P.A.'s capacity to consent. That evidence makes the existence of P.A.'s alleged incapacity to consent more probable. That evidence explains P.A.'s partial amnesia, by virtue of which she was unable to testify that she had even been raped. That evidence tends to explain P.A.'s hazy recollection and thus to render her testimony more credible. Under the peculiar facts here at issue, Lough, although not claiming to be *mistaken* as to P.A.'s capacity to consent, and although admitting sexual intercourse, left in issue the question of whether he drugged P.A. for the purpose of having sexual intercourse and whether she was in fact capable of giving the consent he claims she gave.

C. First Degree Burglary.

■ The State's theory as to first degree burglary was that Lough, who was invited into P.A.'s home for a lawful purpose, entered or remained there for the unlawful purpose of drugging and sexually assaulting P.A.[21] If the jury did not believe that Lough drugged P.A., it could not have convicted him of burglary. Lough's admission of sexual intercourse with P.A. was not an admission of a criminal act unless the jury found that P.A. was physically helpless. By the uncontested evidence, P.A. could not have been physically helpless unless Lough drugged her.

The evidence that Lough was the mastermind of a common scheme or plan to drug and rape women, among them P.A., was relevant and material to the issue of Lough's criminal intent

---

[21]Count 3 of the information charged that Lough "did remain unlawfully in the dwelling of [P.A.] . . . with intent to commit a crime against a person . . . therein, and while in such dwelling . . . did assault . . . [P.A.]" in violation of RCW 9A.52-.020.

for purposes of the burglary charge. His affirmative defense that P.A. consented to sexual intercourse, if believed, would negate that unlawful intent but did not remove intent from issue with respect to the burglary charge. The only way that P.A. could have consented was if she had not been drugged. If she was drugged by Lough, her invitation for Lough to enter her home was withdrawn as a matter of law.[22]

Lough argues that the intent here at issue is no different from and is subsumed in the "knowledge" and "intent" issues arising from the charges of indecent liberties and attempted second degree rape. We agree that this is so. Nevertheless the ER 404(b) evidence at issue here is not thereby rendered entirely irrelevant to the burglary charge.

D. Sufficiency of ER 404(b) Evidence.

Lough challenges the sufficiency of the evidence to support a determination that he formulated a common scheme or plan to drug and rape a series of women. Specifically, he challenges the evidence with respect to P.U. and D.L., arguing that the evidence with respect to them is not sufficient to satisfy the preponderance of the evidence standard of *State v. Tharp*, 96 Wn.2d 591, 593, 637 P.2d 961 (1981) and *State v. Toennis*, 52 Wn. App. 176, 187, 758 P.2d 539, *review denied*, 111 Wn.2d 1026 (1988). Lough also argues that all of the ER 404(b) evidence is simply too remote in time to be probative of a common plan which included P.A. among its victims.

---

[22]For the first time in this appeal, in his supplemental briefing on the ER 404(b) issues which was requested by this court, Lough challenges the sufficiency of the evidence here to support the charge of first degree burglary. Lough relies on *State v. Collins*, 110 Wn.2d 253, 751 P.2d 837 (1988) and *State v. Baeza*, 100 Wn.2d 487, 670 P.2d 646 (1983).

Although Lough raises several interesting *Collins* issues, *Baeza* does not stand for the proposition that an issue, even if of constitutional magnitude, may be raised collaterally for the first time on appeal in a supplemental brief requested by the court on a different issue altogether. Accordingly, we decline to address Lough's *Collins* issues, noting as we do that the jury instructions as to the burglary charge here at issue have not been challenged. Those instructions support the State's theory and constitute the law of this case.

■ We disagree with Lough's contentions. His objections as to P.U. and D.L. go to the weight of the evidence — a question for the jury. His objections as to remoteness are of similar ilk. See discussion, *supra.*

E. Evidence of Hitting and Kicking M.G.

We agree with Lough that the trial court should have sustained Lough's objection on the ground of relevancy to M.G.'s testimony that Lough hit and kicked her. Although this evidence was arguably probative as to whether Lough drugged and raped M.G. and then tried to prevent her from reporting it to anyone, the evidence was not truly probative to the purposes of *this* trial, that being whether Lough was the perpetrator of a common scheme or plan to drug and rape a series of women, including P.A.

■ Nevertheless, we are convinced that the error was harmless. No rational jury would decide that Lough had a common scheme or plan to drug and rape women merely because he may have hit and kicked one of them — a clear aberration from his usual behavior. We decline to reverse for this reason.

IV

Weighing of Probative Value and Prejudice

We find no abuse of discretion in the trial court's determination that the probative value of the ER 404(b) evidence here at issue outweighs its prejudicial effect. Clearly, the evidence was prejudicial to Lough, as is all evidence that is relevant and material to the ultimate issue of guilt of a criminal accused. But the perpetrator of a coldly calculated criminal design has no inherent right to keep the existence of such a plan hidden from the trier of fact, so long as the existence of such plan is relevant to any material issue at trial. A defendant's right to a fair trial is protected by the intense judicial scrutiny which is required before such evidence may be admitted. The appellate courts have shown no hesitancy to reverse the trial courts when such scrutiny is lacking or based upon faulty reasoning. Finding both the

required degree of judicial scrutiny and soundness of reasoning by the trial court in this case, we affirm the trial court's decision to admit the ER 404(b) evidence here at issue.

## V
## Joinder

Lough argues that the trial court erred by failing to dismiss the counts relating to P.A. because they should have been joined with, that is tried together with, the charges relating to P.U. and her daughter S.G. and/or with the charges relating to another alleged victim, C.W. The P.U./S.G. charges were tried in October 1989. The C.W. charge was tried in January 1990. The P.A. charges were tried in November/December 1990. Lough argues that the State waited to see what would happen in the earlier trials before filing the charges relating to P.A. Without citation to the record, Lough argues that the State knew of the P.A. charges by late September 1989, about 2 weeks prior to the commencement of the P.U./S.G. trial.

Although there is no citation to the record contained in Lough's brief for this appeal showing that this issue was raised below, we do find among the clerk's papers Lough's "trial brief" filed of record with the King County Superior Court on July 13, 1990. In that brief Lough raised his motion in limine seeking to suppress the ER 404(b) evidence above discussed and he also sought a dismissal of the charges relating to P.A. on the grounds now argued for this appeal, namely that CrR 4.3(c)(3) requires a dismissal of the P.A. charges.

On September 10, 1990, the trial court ruled upon the motion in limine relating to the ER 404(b) evidence. Lough has provided this court with a transcription of the trial court's oral ruling on that motion. If the trial court ruled on the motion to dismiss pursuant to CrR 4.3(c)(3) on that or any other day, Lough has failed to provide this court with the record, or, if he has provided the record, he has failed to cite it in his brief for this appeal. We decline to search any further for any such record, beyond those portions of the record already mentioned.

Any ruling which the trial court may have made on this issue cannot be reviewed in the absence of the record. CrR 4.3(c)(3) provides that a timely motion to dismiss for failure to join "related charges" shall be granted unless the court determines that the prosecutor was unaware of the facts constituting the related offense or did not have sufficient evidence to warrant trying the second offense at the time of the first trial "or for some other reason, the ends of justice would be defeated if the motion were granted." CrR 4.3(c)(3).

█ An appellant seeking review of a trial court's decision must provide the necessary record. If he or she does not, or if the briefs on appeal do not properly cite to such record as may have been provided, the issues need not be reviewed. *State v. Blight*, 89 Wn.2d 38, 46, 569 P.2d 1129 (1977); *State v. Hensler*, 109 Wn.2d 357, 359, 745 P.2d 34 (1987).

## VI
### Exceptional Sentence

The trial court imposed an exceptional sentence of 30 months on count 1 (indecent liberties; standard range 12 to 14 months); 60 months on count 2 (attempted rape in the second degree; standard range 15.75 to 20.25 months); and 60 months for the first degree burglary (standard range 15 to 20 months). All sentences were imposed to run concurrently.

The exceptional sentence was based on the trial court's findings that Lough invaded P.A.'s zone of privacy and that his crimes against P.A. involved a high degree of sophistication and planning. Lough argues that neither finding is supported by the record or the law. He does not contend that the sentence is clearly excessive.

█ The trial court's findings regarding the presence of aggravating factors are factual determinations which will be upheld unless clearly erroneous. *State v. Grewe*, 117 Wn.2d 211, 218, 813 P.2d 1238 (1991). The legal adequacy of an aggravating factor to justify a departure from the standard range is a question of law. *State v. Dunaway*, 109 Wn.2d 207,

218, 743 P.2d 1237, 749 P.2d 160 (1988). An aggravating factor is legally adequate to justify a sentence outside of the standard range as long as the aggravating factor was not necessarily considered by the Legislature in establishing the standard range, and as long as the asserted aggravating factor is "sufficiently substantial and compelling to distinguish the crime in question from others in the same category." (Citations omitted.) *Grewe*, 117 Wn.2d at 216.

Lough admits that a sexual crime committed in a person's bedroom may constitute an invasion of a victim's zone of privacy. *See State v. Falling*, 50 Wn. App. 47, 747 P.2d 1119 (1987).[23] However, he contends that since the rape occurred in P.A.'s living room and not in her bedroom, it did not occur in P.A.'s zone of privacy. We disagree. A victim's sense of violation of her zone of privacy would likely be equal whether she was raped in her bedroom, living room, kitchen or any other portion of her home. The fact that Lough was initially invited into P.A.'s home does not alter our view. The invitation was automatically revoked when Lough drugged P.A.

We agree with Lough that invasion of a zone of privacy cannot justify an exceptional sentence for burglary. *See State v. Post*, 59 Wn. App. 389, 797 P.2d 1160 (1990), *aff'd*, 118 Wn.2d 596, 614, 826 P.2d 172, 837 P.2d 599 (1992). However, the fact that Lough was convicted of burglary does not mean that invasion of a zone of privacy cannot be used to justify an exceptional sentence for the other two counts. Because the burglary sentence runs concurrently with the 60-month sentence for attempted rape, the error is harmless.

Lough also contends that planning and sophistication cannot be used to justify the exceptional sentence in this case

---

[23]*But see State v. Campas*, 59 Wn. App. 561, 568, 799 P.2d 744 (1990), *remanded*, 118 Wn.2d 1014 (1992), where Division Two of this court indicated that invasion of a zone of privacy can probably not constitute a valid aggravating factor. This issue appears to have been resolved, however, in *State v. Collicott*, 118 Wn.2d 649, 662, 827 P.2d 263 (1992) (temporary bedroom in a residential treatment center constitutes a zone of privacy).

because planning and sophistication are necessarily encompassed in the charge of attempting to rape a physically helpless person where the evidence indicates that the would-be rapist deliberately drugged the victim. Lough argues that, just as forcible compulsion cannot be treated as an aggravating factor in a second degree rape committed by that means, the planning and sophistication necessary to locate and administer drugs in order to render a victim physically helpless has already been factored into the standard range for attempted second degree rape of a physically helpless person.

■ We disagree. A sexual assault upon a physically helpless victim is usually a crime of opportunity, rather than a crime involving the sophistication and planning necessary to render a victim physically helpless for the purpose of sexual assault. As defined by the Legislature, neither indecent liberties upon nor attempted rape of a physically helpless person require that the defendant render the victim physically helpless. Taking advantage of an opportunity to abuse a physically helpless person is sufficient. *See, e.g., State v. Puapuaga*, 54 Wn. App. 857, 776 P.2d 170 (1989).

Here, there is ample evidence that Lough utilized his technical expertise to drug and sexually assault P.A., going so far as to call her the next morning to reinforce the idea that P.A. had merely fallen asleep and that nothing had happened. We do not believe this degree of sophistication and planning was necessarily contemplated by the Legislature in the passage of RCW 9A.44.100(1)(b) and .050(1)(b).

Finding no reversible error in this case, we affirm Lough's convictions and his exceptional sentence.

WEBSTER, C.J., concurs.

SCHOLFIELD, J. (dissenting) — Because I believe the majority opinion allows propensity evidence into the defendant's trial in direct violation of ER 404(b), I respectfully dissent.

In May 1990, this court filed its opinion in *State v. Lynch*, 58 Wn. App. 83, 792 P.2d 167, *review denied*, 115 Wn.2d 1020 (1990). In *Lynch*, the defendant was charged with a robbery in Bellevue, Washington, many aspects of which were identical to robberies committed by the defendant in Los Angeles and Portland. Despite the similarities, we ruled that the evidence of the Los Angeles and Portland robberies was not admissible to show a common scheme or plan[24] because there was no causal connection:

> The common plan or scheme exception, however, refers to a larger criminal design of which the charged crime is only one part. *State v. Bowen*, 48 Wn. App. 187, 192, 738 P.2d 316 (1987). The scope of the common plan exception is limited to evidence showing a causal connection between the other crime or act and the charged crime,
>> so that proof of the other offense could be said to evidence a pre-existing design, system, plan, or scheme directed toward the doing of the very act charged.
>
> *Bowen*, 48 Wn. App. at 192 (quoting *State v. Goebel*, 40 Wn.2d 18, 21, 240 P.2d 251 (1952)); *see also State v. Harris*, 36 Wn. App. 746, 751, 677 P.2d 202 (1984).

*Lynch*, at 88.

The *Lynch* court's explanation of the limited use of evidence of similar acts to show common scheme or plan is a correct statement of the rule. If the evidence of prior similar acts does not show a causal connection between the prior acts and the act charged, it is not admissible to show common scheme or plan.

The *Lynch* case cites and is consistent with *State v. Bowen*, 48 Wn. App. 187, 738 P.2d 316 (1987), where the court ruled that evidence that a doctor made house calls on two female patients and fondled their breasts was not evidence of a common scheme or plan to fondle the breast of a third woman, the victim in the case on trial.

The majority opinion relies upon mere similarities among different crimes to support its conclusion that evidence of Lough's prior misconduct with other women is enough to

---

[24]The evidence of the prior robberies was, however, admissible on the issue of identification.

establish a common scheme or plan. The majority's reasoning eviscerates the protection of ER 404(b) and is similar to that criticized in *State v. Harris*, 36 Wn. App. 746, 751, 677 P.2d 202 (1984), where the court said:

Common scheme, plan or design has been described as:
an antecedent mental condition which evidentially points to the doing of the act planned. Something more than the doing of similar acts is required in evidencing design, as the object is not merely to negative an innocent intent, but to prove the existence of *a definite project* directed toward completion of the crime in question.
(Italics ours.) Slough & Knightly, *Other Vices, Other Crimes*, 41 Iowa L. Rev. 325, 329-30 (1956).
Under this definition, it is obvious the two rapes here do not qualify as links in a chain forming a common design, scheme or plan. At most they show only a propensity, proclivity, predisposition or inclination to commit rape. Such evidence is explicitly prohibited by ER 404(b).

The majority opinion fails to show that the commission of any one or more of the prior alleged acts of misconduct by Lough was done with the objective of making a sexual assault upon P.A., the victim in this case. Furthermore, the record does not show that Lough even knew P.A. at the time the prior alleged assaults occurred.

There being no causal connection between the alleged prior assaults and the assault on P.A., the evidence of prior assaults was not admissible to show a common scheme or plan. Its only purpose was to show that Lough had a propensity or predisposition to commit rape. Thus, the admission of the evidence of prior assaults violated the purpose of ER 404(b).

There being no question about the prejudicial effect of such evidence, Lough is entitled to a new trial.

Review granted at 122 Wn.2d 1022 (1993).