[No. 6603-0-I.   Division One.   April 7, 1980.]

THE STATE OF WASHINGTON, *Respondent,* v. ANTHONY FERNANDEZ, *Appellant.*

*Kempton, Savage & Gossard* and *Anthony Savage,* for appellant (appointed counsel for appeal).

*Norm Maleng, Prosecuting Attorney,* and *Thomas E. Kelly, Deputy,* for respondent.

SWANSON, J.—Anthony Fernandez was convicted of the first degree murder of his wife, Ruth Fernandez. He appeals from the judgment and sentence, contending he was deprived of a fair trial because evidence of prior unrelated criminal acts and expert testimony regarding his wife's signature were improperly admitted and because the jury was erroneously instructed regarding consideration of such evidence. Only in defendant's pro se brief is there any contention that the evidence is not sufficient to sustain the verdict of the jury.[1] Further, in appellant's memorandum of additional authorities, which we permitted appellant to file after oral argument, he challenges an intent instruction on the constitutional grounds discussed in *Sandstrom v. Montana,* 442 U.S. 510, 61 L. Ed. 2d 39, 99 S. Ct. 2450 (1979).

It is undisputed that Ruth Fernandez met a violent death on or about July 26, 1974. Her body was discovered over 100 feet down the slope from a narrow logging road near the wreckage of a motor home. A skull fracture and bruises to the brain caused her death. The State's theory is that Anthony Fernandez murdered his wife to obtain her property and collect on several insurance policies and then attempted to cover up his crime by staging an accident. The defendant denied the charge and claimed his wife died

---

[1] Fernandez appeared pro se at trial but had the assistance of counsel. He is represented on appeal but filed a supplemental pro se brief.

from injuries received when the motor home she was driving accidentally went off the road.

Fernandez and his wife owned land in the Mount Si–North Bend area of King County. In late June of 1974 the two spent a week camping in the area in a rented Winnebago motor home. According to Fernandez, on June 26 his wife left the campsite in the Winnebago to return to the couple's Auburn home, and he followed about half an hour later driving a Jeep.

Ruth Fernandez never arrived in Auburn. The next day Fernandez and his wife's daughter's fiance found the body of Mrs. Fernandez partway down the steep bank. They located the wreckage of the motor home over 100 feet further down the slope. Tests showed the victim's blood alcohol level was .15 percent and might have been as high as .24 percent at the time of the accident. At the scene a rock was found imbedded in the road which defendant argues might have caused the deceased to swerve. However, the rock protruded only 4 inches above the road surface, and there were no skid marks at the scene. Expert witnesses disagreed as to whether Mrs. Fernandez was inside the vehicle when it went off the road.

Fernandez was inconsistent regarding his activities on the night of the accident. In a deposition he stated that his wife left first, that he made no phone calls on his way to Auburn, and that he did not know anything was wrong until he got home. However, a waitress who had served Fernandez and his wife earlier in the day testified that she received a call from Fernandez that evening and that he told her he was home and that he had left his wife at the campsite because she planned to take a walk in the woods. There was evidence that the Fernandez marriage was unhappy and that Fernandez was having an affair. It was also shown that Ruth Fernandez had a substantial estate including several life insurance policies which would benefit the defendant upon her death. In addition to existing policies of $84,000, the defendant had obtained a $100,000 policy on Ruth's life by forging her name to an application,

according to the testimony of the State's document examiners.

The State was allowed to introduce, over objection, testimony by Mr. and Mrs. William Belcher about an incident occurring in 1958 in which Fernandez allegedly assaulted Mr. Belcher with an iron bar and left him for dead in the Canadian woods. Belcher and Fernandez had gone to a remote area in British Columbia for the purpose of examining some timber Fernandez was interested in purchasing. Belcher survived the alleged assault, and when his wife went to Canada to visit him in the hospital, she found, in his suitcase at his hotel room, documents appearing to be business agreements between Fernandez and Belcher. The documents, exhibits 112 and 113, are copies of purported agreements entered into between Fernandez and Belcher for sale of British Columbia property and for the purchase of logging vehicles by Belcher from Fernandez for $40,000. Belcher had no prior knowledge of the purported agreements, and he later discovered that $40,000 had been withdrawn from his bank account.

The court also admitted into evidence the transcript of the testimony of John Casteel given in a 1962 federal trial in which Fernandez was one of the defendants. *See Fernandez v. United States*, 329 F.2d 899 (9th Cir. 1964). The gist of the testimony was that in 1961 Casteel and Fernandez were in the Longview area inspecting some timberland. After driving 6 or 8 miles into the woods in Fernandez' Jeep, Fernandez declared he had lost control of the vehicle and bailed out. With Casteel still inside, the Jeep went off the road and down a bank about 20 feet. Casteel also survived and returned to his Oregon home where he discovered, in his luggage, documents bearing his forged signature which transferred interests in various lands to an Oregon timber products company headed by a Mr. Dual, who was codefendant with Fernandez in the federal trial.

In a pretrial hearing the court ruled inadmissible, on the grounds of prejudice, part of the Casteel transcript in which Fernandez reportedly referred to Casteel as a "tough old

bird to kill." The remainder of the Casteel transcript and the Belcher testimony were ruled admissible because they showed a distinctive modus operandi. The claimed erroneous admission of this evidence is the basis for the appellant's first two assignments of error.

The frequently stated rule in this state and elsewhere is that a defendant must be tried for the offenses charged in the indictment or information. Evidence of unrelated crimes is irrelevant and generally held inadmissible. *State v. Goebel,* 36 Wn.2d 367, 218 P.2d 300 (1950). This principle is an application of a policy which prohibits introduction by the State of evidence of a defendant's bad character unless relevant for some other purpose. Such rule of exclusion is subject to a number of exceptions almost as well recognized as the rule itself. *See State v. Hames,* 74 Wn.2d 721, 446 P.2d 344 (1968). These exceptions are to show motive, intent, the absence of accident or mistake, a common scheme or plan, or identity. *State v. Goebel,* 40 Wn.2d 18, 240 P.2d 251 (1952). This list of *Goebel* exceptions is not necessarily exclusive. *State v. Dinges,* 48 Wn.2d 152, 292 P.2d 361 (1956). An additional exception generally recognized is the so-called "handiwork" exception. Thus, evidence of other unrelated crimes may be admissible if such other crimes are so nearly identical in method as to earmark them as the handiwork of the defendant. *Nasim v. State,* 34 Md. App. 65, 366 A.2d 70 (1976); E. Cleary, *McCormick on Evidence* § 190 (2d ed. 1972). We described this concept in *State v. Irving,* 24 Wn. App. 370, 601 P.2d 954 (1979) at page 374, as "a similarity of the modus operandi" and said,

> Under this principle, the method employed in the commission of both crimes is so unique that mere proof that an accused committed one of them creates high probability that he also committed the act charged. In order to utilize this principle the facts of both crimes must be "so similar and peculiar in nature as to show a modus operandi." *State v. Whalon* [1 Wn. App. 785, 464 P.2d 730 (1970)], at 792. Professor Meisenholder describes the basic requirement as:

Mere similarity of crimes will not justify the introduction of other criminal acts under the rule. There must be something distinctive or unusual in the means employed in such crimes and the crime charged.

(Footnotes omitted.) 5 R. Meisenholder, Wash. Prac. § 4, at 13 (1965).

A classic example of the "handiwork" exception is found in *People v. Peete,* 28 Cal. 2d 306, 169 P.2d 924 (1946). Louise Peete was charged with murdering one Margaret Logan as part of a scheme wherein Peete sought out persons with substantial assets and killed them to acquire their property. There was evidence Peete had forged Mrs. Logan's signature to various documents to acquire possession of her property and had then shot Mrs. Logan at close range in an attempt to sever her spinal cord. The State introduced, over Mrs. Peete's objection, evidence that she had been convicted 20 years earlier of murdering one Denton by shooting him in the neck in such a way that his spinal cord was severed. Afterwards she essentially took over Denton's property, drawing forged checks against his bank account and leasing his residence. On appeal, Mrs. Peete argued that the prior murder did not fit into any of the generally recognized exceptions to the rule and was thus inadmissible. Justice Traynor formulated a test to establish the "handiwork" exception:

Evidence concerning another offense is relevant to prove that a death resulted from the execution of a scheme when in the light of the circumstances of the crime sought to be proved, it indicates the existence of such a scheme. When a defendant's conduct in connection with the previous crime bears such similarity in significant respects to his conduct in connection with the crime charged as naturally to be explained as caused by a general plan, the similarity is not merely coincidental, but indicates that the conduct was directed by design.

*People v. Peete, supra* at 317.

The admissibility of prior criminal acts does not depend solely upon whether the evidence can be fitted into an exception to the general rule. As our Supreme Court

stated in reference to the five so-called *Goebel* exceptions,

> These exceptions are not necessarily exclusive; in numerous cases cited, we have pointed out that the true test of admissibility is that the evidence of other criminal offenses must be relevant and necessary to prove *an essential ingredient* of the crime charged.

*State v. Dinges, supra* at 154. The requirement of relevancy is satisfied if there is a logical relationship between the misconduct and the question of defendant's guilt, that is, if it is necessary to prove an essential ingredient of the crime charged or probative of an issue in the case.

In *State v. Bell,* 10 Wn. App. 957, 521 P.2d 70 (1974), we upheld admission of testimony of a caseworker in a murder trial concerning injuries of a child–abuse victim and the child's reaction to the defendant to prove that the injuries were intentionally inflicted and to negate defendant's contention that the injuries resulted from an accident.

Likewise, in *State v. Messinger,* 8 Wn. App. 829, 509 P.2d 382 (1973), we upheld the admission of testimony regarding a defendant's acts of misconduct subsequent to the crime which included stated plans to kill other women to divert attention from himself and to indicate that a sex maniac was loose in the area. Such evidence was admitted on the basis that it tended to show consciousness of guilt and was probative of the issue of identity.

But whether the evidence is relevant to prove an ingredient of the crime charged does not end the inquiry. We stated in *State v. Terry,* 10 Wn. App. 874, 882, 520 P.2d 1397 (1974),

> The true test of admissibility, however, is twofold: (1) The evidence of other offenses sought to be admitted must be relevant and necessary to prove an essential *element* of the crime charged, that is, as the court stated in *Messinger* at page 837, "[T]here must be a logical relationship between the . . . misconduct and the question of defendant's guilt," and (2) the relevance and necessity of the evidence must not be outweighed by its prejudice to the defendant because as was stated in *State v. Golladay,* 78 Wn.2d 121, 143, 470 P.2d 191 (1970), "[E]vidence,

however competent, is rarely admissible when its relevancy is entirely engulfed by the prejudice which it may engender."[2]

(Italics ours.)

Therefore, if evidence of prior unrelated crime is probative of an ingredient of the crime charged so that there is a logical relationship of the misconduct to the crime charged, it is relevant. However, the ultimate test of admissibility is whether the relevance and necessity of the evidence outweighs its prejudice. If the relevancy of prior unrelated acts of misconduct is so minimal as likely to be overshadowed by the prejudice engendered, it will be excluded. In other words,

> [W]hen the trial court is convinced that its effect would be to generate heat instead of diffusing light, or, . . . where the minute peg of relevancy will be entirely obscured by the dirty linen hung upon it. This is a situation where the policy of protecting a defendant from undue prejudice conflicts with the rule of logical relevance, and a proper determination as to which should prevail rests in the sound discretion of the trial court, . . .

*State v. Goebel,* 36 Wn.2d at 379. In applying the foregoing principle to the case at bar, the relevancy of the Belcher and Casteel testimony cannot be doubted. The prosecution's evidence supported its theory that the death of Mrs. Fernandez was part of a scheme to acquire property by violent means. Therefore, proof of such a scheme was an essential ingredient of the State's case. The Belcher and Casteel incidents demonstrated that Fernandez had employed generally similar schemes previously to acquire property. In both prior incidents, Fernandez took his intended victim to a remote area—Belcher was taken to a narrow road in the wilds of British Columbia, and Mr. Casteel into rugged timberland east of Longview in a Jeep.

---

[2]We believe the use of the word "element" italicized in the quote from the *Terry* opinion was meant to be synonymous with the word "ingredient" as used in *State v. Dinges, supra,* and also used in page 883 of the *Terry* opinion.

Testimony was presented that he struck Belcher with an iron rod and left him for dead and then transferred property from Belcher to himself by forged documents. He drove his vehicle off the road, with Mr. Casteel inside, while he leaped to safety. Fernandez then attempted to fraudulently transfer Casteel's property. In addition to the marked similarity of the prior incidents to the crime charged, Fernandez employed similar distinctive means to carry out his scheme of acquiring the property of others. Testimony regarding such prior misconduct indicated a similar modus operandi and was admissible within the "handiwork" exception.

In addition, the evidence was relevant to establish the identity of the wrongdoer and rebut the defense explanation of an accident—essential ingredients of the State's case.

■ Defendant also argues that the remoteness of the Belcher and Casteel incidents, which occurred in 1958 and 1962, respectively, minimized any relevance to the 1974 death of Mrs. Fernandez. While remoteness clearly affects the weight to be given such testimony, it bears only upon admissibility to the extent remoteness of the incident affects its probative value. Courts repeatedly have said that the question of excluding evidence because of its remoteness rests largely in the sound discretion of the trial court. *State v. Stevenson*, 169 Wash. 10, 13 P.2d 47 (1932).

We are convinced that the trial court properly exercised its discretion. The trial judge was keenly aware of the potential for mischief that the admission of such evidence might engender. Consequently, an exceptionally prejudicial portion of the Casteel transcript, the reference to Casteel being a "tough old bird to kill," was stricken. In addition, an instruction was given advising the jury that the Belcher and Casteel evidence was admitted for the limited purpose of determining whether it showed a "characteristic method, plan or scheme in the commission of acts similar to the method, plan or scheme used in the commission of the

crime charged in this case." Instruction No. 12.[3]

■ Appellant contends that limiting the instruction compounded the error committed in admitting the Belcher testimony and the Casteel transcript, because it conveyed to the jury that the court believed the crime had in fact been committed and so amounted to a comment on the evidence. We note that the instruction is couched in qualifying terms such as "the crime, *if any,* of which the defendant is accused". (Italics ours.) When read in conjunction with other instructions, we do not believe the instruction complained of amounted to a comment on the evidence. "A questioned portion of an instruction should not be considered as an isolated sentence or clause, but should be considered together with the instructions in their entirety. *Myers v. West Coast Fast Freight,* 42 Wn. (2d) 524, 256 P. (2d) 840." *Qualls v. Golden Arrow Farms, Inc.,* 47 Wn.2d 599, 604, 288 P.2d 1090 (1955).

Fernandez next argues that the trial court erred in allowing expert witnesses for the State to testify that the victim's signature on the application for the $100,000 life insurance policy, exhibit 16, was a traced forgery. He contends the opinions were based upon comparisons with documents either not admitted at trial or not identified by persons who saw the victim sign her name. He cites *State v. McGuff,* 104 Wash. 501, 177 P. 316 (1918), for the rule that

---

[3] "Evidence has been presented by the plaintiff as to the defendant's acts other than those for which he has been charged.

"Such evidence was not received and may not be considered by you to prove that he is a person of bad character or that he has a disposition to commit crimes.

"Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show:

"1. The identity of the person who committed the crime, if any, of which the defendant is accused; and

"2. A characteristic method, plan or scheme in the commission of acts similar to the method, plan or scheme used in the commission of the crime charged in this case.

"For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case.

"You are not permitted to consider such evidence for any other purpose." Instruction No. 12.

standards of comparison must be proven by direct and positive evidence. One of the witnesses, however, testified on redirect examination that his opinion was based on comparison of the application with a notarized document, exhibit 15,[4] and another document, identified by the victim's daughter and admitted as exhibit 2. This is in contrast to *McGuff*, where no authentic signature for comparison was proven.

As to the other expert witness, he also relied in part upon exhibits 2 and 15. In addition, the signature on the insurance application was determined to be a traced forgery, meaning the characteristics indicating forgery were manifest without comparison to exemplars. The record suggests that the witness used the exemplars primarily to substantiate his conclusion of traced forgery. We find no error in the admission of the expert testimony.

In a supplemental pro se brief, appellant Fernandez makes several assignments of error claiming violations of constitutional rights. Fernandez' arguments are without merit. Several of the claims of error are not supported by reference to the record, and the arguments relating to the State's failure to preserve or disclose evidence consist primarily of rhetorical questions which speculate on what might have been contained in documents not made available to appellant.

Appellant contends in his memorandum of additional authorities that it was reversible error to give the following instruction to the jury:

> The court instructs the jury that *the law presumes that every man intends the natural and probable consequences of his own acts*. It is not necessary to establish intent by direct and positive evidence but intent may be established by inference and in the same way as any other fact by taking into consideration the acts of the parties and all the facts and circumstances of the case.

---

[4]Exhibit 15, a notarized power of attorney, complies with the requirements of RCW 64.08.050 and would be admissible pursuant to ER 902(h). *See* 5 J. Wigmore, *Evidence* § 1676b (1974).

(Italics ours.) Instruction No. 7.[5] In attacking the instruction quoted appellant relies primarily on a recent decision of the United States Supreme Court, *Sandstrom v. Montana,* 442 U.S. 510, 61 L. Ed. 2d 39, 99 S. Ct. 2450 (1979), in which the Supreme Court reversed and remanded for new trial a murder conviction because of an instruction similar to that given here.

We first observe that the only exception taken to the giving of instruction No. 7 was on the basis that it was not necessary. In fact, appellant's counsel stated that he agreed with the proposition that the law presumes every man intends the natural and probable consequences of his act. Because of the inadequacy of the exception and the tardiness of any assignment of error, we need not consider it for the first time on appeal. However, a significant constitutional issue is presented by the giving of this instruction; therefore, justice requires that we review appellant's contentions. *State v. Kroll,* 87 Wn.2d 829, 558 P.2d 173 (1976).

An examination of the facts in *Sandstrom* discloses significant distinguishing features. Sandstrom was charged with deliberate homicide. He admitted that he killed the victim, but his defense was that he did not do so "purposely or knowingly," and so was not guilty of deliberate homicide. Thus, the element of intent was a significant factual issue in the case. Consequently, an instruction which told the jury that "*the law presumes* that a person intends the ordinary consequences of his voluntary acts", *Sandstrom,* at page 517, would have the effect of shifting the burden to the defendant to refute the only element of the case that was in contention, defendant's intent. It was on that basis that Sandstrom objected to the instruction.

The *Sandstrom* court discussed primarily two types of presumptions: Conclusive presumptions which conflict with the presumption of innocence and invade the fact–finding function of the jury as discussed in *Morissette v. United*

---

[5]Subsequent to oral argument we granted appellant's motion to file additional authorities and gave the State an opportunity to respond.

*States,* 342 U.S. 246, 96 L. Ed. 288, 72 S. Ct. 240 (1952), and *United States v. United States Gypsum Co.,* 438 U.S. 422, 57 L. Ed. 2d 854, 98 S. Ct. 2864 (1978), and presumptions which have the effect of shifting the burden of proof and found constitutionally defective in *Mullaney v. Wilbur,* 421 U.S. 684, 44 L. Ed. 2d 508, 95 S. Ct. 1881 (1975). In deciding that the instruction violated the defendant's Fourteenth Amendment due process rights, the *Sandstrom* court noted:

> First, a reasonable jury could well have interpreted the presumption as "conclusive," that is, not technically as a presumption at all, but rather as an irrebuttable direction by the court to find intent once convinced of the facts triggering the presumption. Alternatively, the jury may have interpreted the instruction as a direction to find intent upon proof of the defendant's voluntary actions (and their "ordinary" consequences), unless *the defendant* proved the contrary by some quantum of proof which may well have been considerably greater than "some" evidence—thus effectively shifting the burden of persuasion on the element of intent.

*Sandstrom,* at 517. The court explained its holding by stating,

> Because David Sandstrom's jury may have interpreted the judge's instruction as constituting either a burden–shifting presumption like that in *Mullaney,* or a conclusive presumption like those in *Morissette* and *United States Gypsum Co.,* and because either interpretation would have deprived defendant of his right to the due process of law, we hold the instruction given in this case unconstitutional.

442 U.S. at 524.

But as the concurring opinion in *Sandstrom* observed in quoting from *Cupp v. Naughten,* 414 U.S. 141, 147, 38 L. Ed. 2d 368, 94 S. Ct. 396, 400 (1973), "'[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'" *Sandstrom,* at 527. In the instant case, the instructions when considered as a whole told the jury that the State had the burden of proving each of the elements of the crime

beyond a reasonable doubt. It seems clear beyond perad-venture that instruction No. 7 did not relieve the State of its burden of proving appellant's guilt beyond a reasonable doubt, which included proof of the element of intent.[6] *State v. Bishop,* 90 Wn.2d 185, 580 P.2d 259 (1978); *See State v. Roberts,* 88 Wn.2d 337, 562 P.2d 1259 (1977); *State v. Vandiver,* 21 Wn. App. 269, 584 P.2d 978 (1978). Fur-ther, in reading instruction No. 7 in full, it is clear that the jury was simply advised that intent may be established by inference and that the presumption is simply a permissive inference. In *Sandstrom* the court rejected the contention that the inference was permissive on the basis that a rea-sonable juror could have viewed such instructions as man-datory. Further, even the prosecutor in *Sandstrom* conceded that under the circumstances of the case the instruction was possibly mandatory. In the instant case, instruction No. 7 said in part, "Intent *may* be established by inference . . ." (Italics ours.) The use of the word "may" militates against a conclusion that the presumption is man-datory or conclusive. And if the instruction describes a per-missive inference rather than creating either a burden-shifting presumption or a conclusive presumption, it is free of any constitutional impediment.

■ Our Supreme Court has noted, in discussing the constitutionality of presumptions in instructions, that the court has "proceeded on a case–by–case basis, considering the manner in which each presumption encroaches upon

---

[6]Instruction No. 5 states: "To convict the defendant of the crime of murder in the first degree, each of the following elements of the crime must be proved beyond a reasonable doubt: (1) On or about the 26th day of July 1974, the defendant did cause Ruth Fernandez to be struck on the head; (2) The defendant acted with intent to cause the death of Ruth Fernandez; (3) The intent to cause death was premeditated; (4) Ruth Fernandez died as a result of the defendant's acts; and (5) The acts occurred in King County, Washington.

"If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

"On the other hand, if, after weighing all of the evidence, you have a reason-able doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty."

defendant's due process rights under the facts of the particular case." *State v. Blight,* 89 Wn.2d 38, 45, 569 P.2d 1129 (1977).

The disputed facts in *Sandstrom* related only to the element of intent and stand in sharp contrast to the factual contention in the instant case.

The primary focus of the case at bench was on the question of whether the death of Ruth Fernandez was an accident or the result of an act of the appellant. Consequently, intent was never seriously put at issue. In *Sandstrom,* intent was *the* determinative issue, and in such circumstances an instruction containing a presumption of intent was clearly impermissible.

In *United States v. Crist,* 473 F. Supp. 1354 (D. Mont. 1979), the court discussed the instruction found improper in *Sandstrom* and held it to be harmless error. The court said:

> This error did not go to the essence of the case. In the first instruction given, the jury was told that in order to convict the defendant every necessary material fact must be proved by the State with competent evidence beyond a reasonable doubt. That obligation to go forward on every element of the offense charged was clearly stated and overcomes the possible suggestion that the petitioner had the burden of producing evidence as to his intent. Further, the instruction has little relevance in this case. If the defendant claimed that he voluntarily fired the rifle at the victim, but without intending to kill him, this error might be more prejudicial since the instruction would then create a presumption that he actually intended to kill. His claim that he did not voluntarily fire the rifle negates any possible prejudice.

*United States v. Crist, supra* at 1357–58.

As in *Crist,* Fernandez' claim that his wife's death resulted from an accident rather than from his act "negates any possible prejudice" engendered by the use of instruction No. 7.

Our examination of the record indicates that the defendant had a fair trial, if not a perfect trial. We find no error.

Judgment affirmed.

JAMES, C.J., and CALLOW, J., concur.

Reconsideration denied June 19, 1980.

Review by Supreme Court denied with remand to Court of Appeals December 19, 1980.