[No. 31067-4-I.    Division One.    September 26, 1994.]

THE STATE OF WASHINGTON, *Respondent*, v. RANDOLPH
G. ROTH, *Appellant*.

*George W. Cody* and *Cody, Hatch & Blanchard, Inc., P.S.; Jeffrey C. Grant* and *Hagens & Berman,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Marilyn B. Brenneman* and *Susan Storey, Deputies,* for respondent.

PEKELIS, A.C.J. — Randolph Roth appeals his convictions on one count of first degree murder, one count of first degree theft, and one count of second degree theft. He contends the trial court erred in several respects: (1) admitting evidence concerning the death of Roth's second wife; (2) denying his motion for a continuance so that his lead counsel could be present for jury voir dire; (3) denying his motion for a continuance sought to procure expert rebuttal testimony; (4) denying his motion to sever the theft counts from the murder count; (5) admitting testimony concerning Roth's harsh discipline of his stepsons; (6) admitting a handwritten note by the victim; and (7) imposing an exceptional sentence. We affirm both the conviction and sentence.

## FACTUAL OVERVIEW

On July 23, 1991, Cynthia Baumgartner Roth drowned in Lake Sammamish during an outing on an inflatable raft with her husband, Randy Roth. At the time of Cynthia's death, Roth was the beneficiary of $385,000 in insurance on Cynthia's life. Cynthia, a 34-year-old mother of two, was

Roth's fourth wife. Roth's second wife, Janis, died in 1981 when she fell from a cliff while hiking with Roth. Roth, who was the beneficiary of a $100,000 insurance policy on Janis' life, said that she had slipped and fallen off the trail.

The King County Police Department's investigation concerning the circumstances of Cynthia's death included several interviews with Roth. According to Roth, Cynthia developed a leg cramp while swimming. While Roth was preparing to steady the raft so that Cynthia could climb in, a boat went by and its wake turned the raft over on top of her. He then heard her cough, "as if she unexpectedly got water in her mouth"; after about 30 seconds he righted the raft. At that point, Cynthia was lying face down in the water. Roth then "breathed into her a couple times", but there was no response. Roth reentered the raft, and pulled her into it. Discovering that Cynthia had no pulse, he rowed back to shore; the trip took approximately 20 minutes. Roth did not attempt to summon aid from other boats on the water, nor did he alert anyone on the shore as he approached. When Cynthia's sons came to the raft, he told them to get a lifeguard but not to create a fuss. A lifeguard and a paramedic unsuccessfully attempted to revive Cynthia Roth. During the resuscitation attempt and afterward, Roth was seen calmly collecting the family's beach gear and loading it into the car.

The police investigation revealed discrepancies in Roth's account. Using Roth's raft, investigators conducted and videotaped attempts to reenact the events as described by Roth, which caused them to believe that Roth's account was implausible. The investigation led to the filing on October 10, 1991, of a 1-count information against Roth, charging murder in the first degree. A series of amendments to the information added two counts of theft. A count of theft in the first degree charged Roth with theft of insurance proceeds from his homeowners insurer arising from an allegedly "staged" residential burglary. A count of second degree theft charged Roth with making a false claim for Social Security

benefits on behalf of his son following the death of Cynthia Roth.[1] Roth entered pleas of not guilty to all charges.

Roth's trial commenced on March 10, 1992, and was submitted to the jury on April 22. The jury returned a verdict of guilty on all three counts. The court imposed an exceptional sentence of 600 months on the murder count.

## I

Roth contends that the trial court erroneously admitted testimony relating to Roth's marriage to Janis Miranda Roth and the circumstances of her death, arguing that the evidence was inadmissible under ER 404(b).

Below, the State argued that the evidence was relevant for purposes other than to prove Roth's character, including proof of scheme or plan, proof of motive, proof of distinctive modus operandi, to rebut a claim of accident, and under the doctrine of chances. A summary of the evidence presented by the State is as follows.

In 1981, after a very short courtship, Roth married Janis Miranda, a single mother of an 8-year-old girl. A $100,000 life insurance policy on Janis Roth's life went into effect on November 7, 1981. On November 27, Janis Roth died from a 300-foot fall from Beacon Rock in Skamania County. Roth made numerous conflicting statements as to whose plan it was to visit Beacon Rock that day and about the circumstances of Janis' fall. Investigators found no physical evidence at the scene consistent with someone slipping or falling off the trail and did not believe that the scenario described by Roth was consistent with the location of the fall identified by Roth. There was evidence that the relationship was not going well and that Roth had made certain inferentially incriminating statements to a friend. Specifically, Tim Brocato testified that shortly before the incident Roth had asked whether Brocato could ever kill his wife. After the

---

[1]The information was also amended to include an additional count of theft in the first degree, which charged Roth with stealing property from his employer at or about the time of his arrest. This count was subsequently severed from the others, and Roth eventually pleaded guilty to an amended count of second degree theft.

incident, when Brocato asked about what had happened, Roth stated that he didn't want to tell Brocato something he would have to lie about. Roth did not notify any close friends or relatives of Janis' death, and acted as if nothing had happened after Janis died. The morning after she died, a Saturday, Roth called the insurance agent who sold the policy on Janis Roth's life to discuss receipt of the proceeds. The agent advised Roth that he would have to wait until Monday morning. Within days of the death, Janis Roth's daughter was returned to her natural father in Texas; she received no portion of the insurance proceeds, and Roth applied for and collected the daughter's Social Security benefits for several months.

In 1985, Roth married Donna Clift, a single mother of one girl, after a 3-month courtship that Clift described as "extremely intense". Shortly before the marriage, Roth suggested Clift obtain a large life insurance policy. Roth also convinced Clift to make him the beneficiary of a policy she already held, instead of her daughter. Clift separated from Roth after 3 months because she was scared of him.

In 1986, Roth began a relationship with Mary Jo Phillips, a single mother of six. Shortly after they met, Phillips moved in with Roth, and they discussed marriage. Roth suggested that Phillips would need some life insurance, but she advised him that she was uninsurable because she had been diagnosed with cancer. Shortly thereafter, Roth became increasingly cold toward her, and she moved out.

The State compared these circumstances to the circumstances of Roth's relationship with Cynthia Baumgartner, and to the events surrounding her death. The State pointed out that Cynthia, a single mother, married Roth in 1990 after a very short courtship. Shortly after the marriage, a large insurance policy was obtained on Cynthia's life, naming Roth as beneficiary. At Roth's behest, and against the advice of her insurance agent, Cynthia changed the beneficiary of an existing life insurance policy from her sons to Roth. As with Janis Miranda, Roth claimed the insurance was obtained to cover the home mortgage, even though both

women were homemakers and Roth was the primary wage earner. Shortly before Cynthia's death, which occurred within a year of the marriage, Roth expressed unhappiness with the relationship. The death occurred in a recreational area, but the Defendant was the only witness nearby. Afterward, Roth made inconsistent statements about the events surrounding the death. Many witnesses observed Roth to be unemotional after the incident, and he did not inform relatives and friends of Cynthia's death. Roth quickly filed an insurance claim, and submitted a falsified claim for Social Security benefits on behalf of his son by a prior marriage, Greg Roth.

Based on this series of relationships, together with several incidents of other alleged fraudulent insurance claims, the State claimed that evidence of Janis Roth's death was "critical to the state's theory that the defendant in fact was engaging in acts to defraud insurance companies, it was a common motive . . . that led to the murder of Cynthia Roth."

> The trial court ruled that the Janis Roth evidence
> is highly relevant. I can't see any other solution to it.
>
> . . . [T]he similarities between the acts themselves and the circumstances surrounding them, what went before and what went afterwards, and the relationship of the parties involved, all are strikingly similar in both Janis and Cynthia's events.
>
> . . . [I]t is clear the Janis Roth events would certainly tend to make the later one more probable, which is the test for relevance.
>
> I also think that the evidence, particularly regarding the similarity between the two events, is sufficient to be relevant to the issue of accident. And I have to agree with the state that defendant's position regarding Cynthia's death has to be accident.
>
> . . . .
>
> They're also clearly relevant to motive, which the state is entitled to prove and which is really at the essence of their theory of the case.
>
> . . . I think [*State v. Fernandez*, 28 Wn. App. 944, 628 P.2d 818, 640 P.2d 731, *review denied*, 94 Wn.2d 1026 (1980)] is strikingly on point.
>
> I will for those reasons permit the Janice [*sic*] Roth testimony to be utilized.
>
> . . . I am . . . convinced that its necessity for the state's case outweighs the prejudice it will engender.

The court's written findings reiterated "the state's theory that the current charges against the defendant are part of a larger scheme by the defendant to profit from insurance frauds", which included "the murder of his second wife Janis Miranda Roth for insurance proceeds" and "the murder of Cynthia Roth . . . for insurance proceeds". On this basis, the court entered the following conclusions of law:

> Evidence of all of the circumstances surrounding the death of Jan Roth is **highly** relevant due to the many distinct similarities between those circumstances and the circumstances surrounding the death of Cynthia Roth and is of consequence to the outcome of this action.
>
> The circumstances surrounding the deaths of Jan and Cynthia Roth are sufficiently similar for the evidence of those circumstances to be admissible in this matter to rebut the defendant's claim that Cynthia's death was an accident, and to prove the defendant's motive.
>
> Any potential for prejudice to the defendant from the introduction of evidence of the circumstances surrounding the death of Jan is outweighed by the probative value of the evidence. The defendant's motions [*sic*] in limine in regard to this evidence is denied.[2]

On appeal, Roth first argues that the State did not prove by a preponderance of the evidence that Janis Miranda Roth was murdered by him. The party offering the evidence of prior misconduct has the burden of proving by a preponderance of the evidence that the misconduct actually occurred. *State v. Benn*, 120 Wn.2d 631, 653, 845 P.2d 289, *cert. denied*, 114 S. Ct. 382 (1993).

Roth points out that the evidence regarding Janis Roth's murder was completely circumstantial, and "requires piling inference upon inference." He claims that there are several explanations for the conclusions offered by the State's witnesses, and that other innocent explanations would be "circumstantially consistent" with the State's theory that she was pushed to her death. He complains that the trier of fact

---

[2]The trial court also ruled that testimony regarding the Defendant's other marriages, relationships, and discussions regarding life insurance was admissible "to show the defendant's motive, the existence of a common scheme, and the absence of accident".

was forced to choose between plausible alternatives based upon merely circumstantial evidence.

█ In making this argument, Roth has misunderstood the applicable standard of review. On appeal, a finding that the misconduct actually occurred will be affirmed if supported by substantial evidence in the record. *Benn*, 120 Wn.2d at 653; *State v. Tharp*, 96 Wn.2d 591, 594, 637 P.2d 961 (1981); 5C Karl B. Tegland, Wash Prac., *Courtroom Handbook on Washington Evidence* 162 (1994). The Court of Appeals will uphold the trial judge's interpretation of disputed facts "when any reasonable view substantiates his [or her] findings, even though there may be other reasonable interpretations." *Ebling v. Gove's Cove, Inc.*, 34 Wn. App. 495, 501, 663 P.2d 132, *review denied*, 100 Wn.2d 1005 (1983).

On appeal, Roth's sole argument in support of his challenge to the sufficiency of the evidence is that, in addition to murder, there are other reasonable interpretations of the cause of Janis Roth's death. This cannot suffice. While the evidence of murder was indirect and inferential, it was extensive, including testimony of over 26 witnesses. Review of this testimony leads this court to conclude that there was evidence of a sufficient quantity to persuade a fair-minded, rational person by a preponderance of the evidence that Randy Roth murdered Janis Roth.

Roth's other contention is that the evidence of Janis Roth's death was not admissible to prove any material aspect of the State's case, and thus merely constituted character or propensity evidence inadmissible under ER 404(b).

The parties' briefs focus on the case of *State v. Fernandez*, 28 Wn. App. 944, 628 P.2d 818, 640 P.2d 731, *review denied*, 94 Wn.2d 1026 (1980), which the trial court expressly relied on in its oral opinion and in its written conclusions. According to Roth, *Fernandez* is primarily a "handiwork" or "modus operandi" case; he argues that the Janis Roth evidence is simply insufficient to come within this doctrine.

We agree that the evidence in this case did not suffice as "modus operandi" evidence, and note that the State has not

seriously argued this exception on appeal.[3] But we disagree with Roth's argument that *Fernandez* is primarily a "modus operandi" case. In *Fernandez*, defendant was charged with first degree murder of his wife. In 1974, her body was discovered down a slope near the wreckage of the couple's motor home. Defendant claimed his wife died when the motor home accidentally went off the road. The State's theory was that Fernandez murdered his wife to obtain her property and collect on several insurance policies, and that he then attempted to cover up his crime by staging an accident.

The trial court admitted testimony about two prior incidents, one that occurred in 1958 and the other in 1961. In the first incident, a business associate was taken by Fernandez to a narrow road in the forest for the purported purpose of examining timber Fernandez was interested in purchasing. Fernandez assaulted the victim with an iron bar, left him for dead, and then transferred property from the victim to himself by forged documents. In the second incident, Fernandez drove the victim into the woods to inspect timberland, then drove the vehicle off the road with the victim inside while Fernandez leaped to safety. Fernandez then forged the victim's name in order to obtain fraudulent transfers of his property.

After reviewing the modus operandi doctrine, the Court of Appeals explained that "[t]he admissibility of prior criminal acts does not depend solely upon whether the evidence can be fitted into an exception to the general rule." 28 Wn. App.

---

[3]In general, for character evidence to come within the modus operandi rule, it is not enough that there is a similarity between the prior misconduct and the crime charged. The proponent must meet the "stringent test of uniqueness", *State v. Eastabrook*, 58 Wn. App. 805, 814, 795 P.2d 151, *review denied*, 115 Wn.2d 1031 (1990), that is, the presence of a highly distinctive, unusual, or unique quality in the defendant's conduct such that the separate crimes are recognizable as the handiwork of one person by their characteristic "signature", *State v. Bowen*, 48 Wn. App. 187, 193, 738 P.2d 316 (1987). Here, the commonalities do not rise to the level of distinctiveness required by precedent.

Moreover, the purpose for modus operandi evidence is to *identify* the accused as the person who likely committed the crime. *State v. Coe*, 101 Wn.2d 772, 777, 684 P.2d 668 (1984); Robert H. Aronson, *Evidence in Washington* 404-18 (1991). Here, there was no issue of *identity* of the perpetrator; the question was whether a crime was committed at all, *i.e.*, whether there was a perpetrator.

at 950. Rather, the evidence must be relevant to prove some "essential ingredient" of the crime charged or otherwise probative of an issue in the case. 28 Wn. App. at 951. The court then held that the relevance of Fernandez's prior acts "cannot be doubted", because they supported the State's theory that the death of Mrs. Fernandez "was part of a scheme to acquire property by violent means. Therefore, proof of such a scheme was an essential ingredient of the State's case." 28 Wn. App. at 952. The court also found a "marked similarity" in the "distinctive means" used in the prior incidents and the crime charged, and approved the admissibility of the prior incidents under the "handiwork"/"modus operandi" exception. 28 Wn. App. at 953. Finally, the court stated that the evidence was relevant to "rebut the defense explanation of an accident", also an essential ingredient of the State's case. 28 Wn. App. at 953.

In short, the *Fernandez* court relied upon at least three rationales for admission of the prior acts — modus operandi, common scheme, and to rebut a claim of accident. Therefore, Roth's characterization of the holding as resting only on the handiwork/modus operandi exception is incorrect.[4]

Here, because the events surrounding Janis Roth's death were admissible under ER 404(b) to prove absence of accident, we conclude that the trial court did not err in relying on *Fernandez* as authority.

■■ Use of other crimes and acts to rebut a claim of accident, or to rebut "any material assertion by a party" is a well-established exception to ER 404(b). 5 Karl B. Tegland, Wash. Prac., *Evidence* § 114, at 391; § 117, at 411 (3d ed. 1989). For example, in *State v. Gogolin*, 45 Wn. App. 640, 727 P.2d 683 (1986), the defendant was charged with assaulting his ex-wife by striking her on the head with a revolver. The defendant claimed that she had been injured

---

[4]In fact, of the three, the *Fernandez* court's modus operandi rationale is the least persuasive, since there were readily apparent differences between the means used to accomplish the charged and uncharged crimes, and there was no need to establish identity, because the defendant had claimed the death was an accident, not that someone else had done it.

when she fell backward down the stairs during an argument. At trial, the victim was permitted to testify about a prior incident of assault. This court held that the evidence was relevant and probative since it tended to rebut the defense of accident by demonstrating defendant's history of hostility and abusive conduct toward the victim. "Thus, the evidence tended to make more probable the fact that her injuries resulted from an intentional assault rather than an accident." 45 Wn. App. at 646.

Precedents such as *Fernandez* and *Gogolin* clearly demonstrate that a material issue of accident arises where the defense is denial and the defendant affirmatively asserts that the victim's injuries occurred by happenstance or misfortune. *See also State v. Bell*, 10 Wn. App. 957, 961, 521 P.2d 70 (evidence of prior beatings inflicted on child victim properly admitted in prosecution for second degree murder of a child where defendant claimed child had injured herself by falling from crib), *review denied*, 84 Wn.2d 1006 (1974).

It is undisputed that Roth's defense was that Cynthia Roth's drowning death was accidental — *i.e.*, that no crime occurred. Clearly, then, evidence of a prior incident in which Roth married, insured, and murdered a woman would be highly relevant to a crucial aspect of the State's case: the need to rebut Roth's claim of accident and to establish an intentional killing. Thus, as the trial court concluded, the evidence was highly relevant to a material assertion of the Defendant.

Furthermore, as noted earlier, the *Fernandez* court specifically approved the use of prior similar incidents in which defendant had committed crimes for profit to rebut a claim that the death of defendant's heavily insured wife was an accident. 28 Wn. App. at 953.[5] The charged and uncharged crimes in *Fernandez* were less similar than those in the present case.

---

[5]Although *Fernandez* was a prerule case, the official comment to ER 404 states that the rule "conforms substantially to previous Washington Law". ER 404 cmt.; *State v. Lough*, 70 Wn. App. 302, 316 n.7, 853 P.2d 920, *review granted*, 122 Wn.2d 1022 (1993).

Here, the marked similarities between the victims, the physical circumstances of the crimes, and the relatively complex nature of the crimes support a commonsense inference that the deaths of Roth's spouses were not mere fortuities. Both Janis Roth and the victim of the charged crime were single mothers, both married Roth after very short courtships, both obtained large life insurance policies after the marriage, and both died within a year of marrying Roth. Each death occurred during a recreational outing that was planned by Roth so that he could be alone with the victim, and the location of each death was remote, with no witness nearby. Each killing was an orchestrated plot, predesigned to ensure the availability of a large life insurance policy and to cloak the victim's death with the appearance of accident. We are convinced that these similarities are sufficiently unusual to ensure that even a second recurrence would be objectively improbable. *See generally* Eric D. Lansverk, Comment, *Admission of Evidence of Other Misconduct in Washington To Prove Intent or Absence of Mistake or Accident: The Logical Inconsistencies of Evidence Rule 404(b)*, 61 Wash. L. Rev. 1213, 1228 (1986) (necessary that similarity among incidents meets a threshold level of noncoincidence).

In sum, we conclude that the trial court did not err in ruling that the evidence of Janis Roth's death was relevant to rebut Defendant's claim that Cynthia Roth's death was accidental.

■ In addition, we believe this evidence was admissible to prove a scheme or plan, that is, a larger criminal design of which the charged crime is only one part. *State v. Bowen*, 48 Wn. App. 187, 192, 738 P.2d 316 (1987). To come within this rationale, "[e]ach crime should be an integral part of an over-arching plan explicitly conceived and executed by the defendant . . .". 1 John W. Strong et al., *McCormick on Evidence* § 190, at 800-01 (4th ed. 1992). Proof of the scheme or plan is relevant to show motive, "and hence the doing of the criminal act". *McCormick on Evidence*, at 801.

In a case such as the present, *i.e.*, where the crimes in question do not form part of a single transaction, the issue is defined as follows:

> whether a given court believes the evidence at issue tends to show that the defendant *planned* to commit a series of crimes, including the specific crime being tried, or whether the evidence merely tends to show that the defendant committed two or more crimes which happen to be of a similar nature.

*State v. Lough*, 70 Wn. App. 302, 313, 317, 853 P.2d 920, *review granted*, 122 Wn.2d 1022 (1993).[6]

Roth argues that Janis Roth's death and Cynthia Roth's death were at best circumstantially or generally somewhat similar, which does not suffice under the common plan theory. We disagree. Each of the crimes at issue — premeditated murder of a spouse to obtain life insurance proceeds — required a high degree of planning. The planning that went into the first crime, particularly the selection of location and preparation of a credible explanation for the death, would be useful in accomplishing the subsequent crime.[7] The essence of each crime depended on Roth orchestrating events so as to reduce or preclude the likelihood of detection. And, although there are certainly differences between the precise circumstances of the deaths of Janis and Cynthia Roth, the crimes at issue are of the same class. They both involved marriage of single mothers after a short courtship, purchase of large life insurance policies naming Roth as beneficiary, and the death of the spouses shortly thereafter. *See State v. Lough*, at 319-20 (listing illustrative factors to be considered in analyzing common scheme or plan issue).

---

[6]Division Two has recently taken a narrower view of the common scheme or plan doctrine, holding that such evidence is inadmissible unless a common scheme or plan is actually *an element* of the crime charged. *State v. Stanton*, 68 Wn. App. 855, 863, 845 P.2d 1365 (1993). In light of the long history of the common scheme or plan rationale in Washington, this seems to be an overly restrictive view. *See* 5 Karl B. Tegland, Wash. Prac., *Evidence* § 117, at 96 (Supp. 1994).

[7]Indeed, there were similarities in Roth's explanation of both deaths, including the assertion that it was his spouse's idea to go to a secluded, recreational area in order to spend time alone.

Viewed in light of Roth's entire history of false insurance claims and relationships with other women,[8] evidence of Janis Roth's death was highly probative of Roth's overarching design to obtain insurance proceeds by means that included murder of insured spouses, and the Janis Roth incident tended to prove that Cynthia Roth's murder was just another part of that plan. *See Fernandez*, at 952 (prior murders for profit supported theory that death of spouse "was part of a scheme to acquire property by violent means"). Because a rational trier of fact could find that Roth was the "mastermind" of an overarching plan to marry, insure, and murder women in order to obtain large insurance recoveries, we conclude that the scheme or plan rationale provided an appropriate alternative basis for admission of the evidence of Janis Roth's death.

■ Finally, Roth appears to argue that the prejudicial effect of this evidence outweighed its probative value.[9] The evidence was undeniably prejudicial to Roth. Indeed, the prejudicial effect of ER 404(b) evidence is recognized to be very great when the defense is that the alleged act never took place, there is no eyewitness or physical evidence of crime, and the question of guilt necessarily turns on the credibility of the accused's version of the events. *See State v. Dawkins*, 71 Wn. App. 902, 909-10, 863 P.2d 124 (1993). Nonetheless, it is clear from the record that the trial judge recognized and scrutinized the potential for prejudice, yet reasoned that the evidence was so crucial to a central issue at trial that its probative value outweighed that potential. The trial court's balancing is reviewed for an abuse of discre-

[8]On appeal, Roth has assigned error to admission of evidence of Janis Roth's death, but not to admission of evidence regarding his relationships with Donna Clift and Mary Jo Phillips. The evidence regarding the Clift and Phillips relationships is pertinent to the present inquiry, since uncompleted "manifestations of the alleged plan" are properly considered in deciding whether there was indeed a common scheme, plan, or design in operation. *Lough*, 70 Wn. App. at 324 n.11.

[9]Roth does not expressly argue that the trial court abused its discretion in weighing probative value against prejudice, but asserts generally that the trial judge's ruling allowed "principles of emotion" to take over, leading the jury to believe that Roth was a "bad man".

tion. *E.g., State v. Robtoy*, 98 Wn.2d 30, 42, 653 P.2d 284 (1982). In light of the broad discretion conferred on the trial judge in this context, we conclude that the trial court acted well within its discretion in determining that the probative value of this evidence outweighed its prejudicial effect. In conclusion, the trial court did not err in admitting the evidence regarding Janis Roth's death under ER 404(b).

## II

Next, Roth contends that his Sixth Amendment right to retain counsel of choice was infringed by the trial court's failure to grant a continuance to permit his lead counsel, George Cody, to be present during jury selection.

The events pertinent to this issue are as follows. On the day trial was set to commence, February 24, it transpired that Mr. Cody was in the midst of another trial. Later that day, the trial judge "suggested the possibility" of proceeding with jury selection in Mr. Cody's absence, with cocounsel "Mr. [John] Muenster handling it". Mr. Cody objected and indicated that Roth did not want that to occur. Mr. Cody represented to the court that Roth "definitely wants my presence since I have been involved in advising him on this matter from the very first day . . ., [a]nd it was never intended that Mr. Muenster take the lead on this case."

Mr. Cody indicated that the other matter was "a three-to-four-day case". On that basis, the court continued the commencement of trial until the following Monday, March 2.

Mr. Cody's conflict had not resolved itself by Monday morning, however. Defense counsel renewed Roth's request that jury selection not commence until Mr. Cody's other obligations had ended. The State replied that "Mr. Roth is attempting to exercise . . . the right of two counsels of choice rather than simply a matter of counsel of choice." The court instructed the parties to proceed with jury selection in Mr. Cody's absence.[10]

---

[10]Apparently, the court agreed to arrange for transcripts of voir dire for Mr. Cody to review prior to the exercise of peremptory challenges. It is not clear from the record, however, whether a full transcript of the entire jury voir dire was in fact provided to Mr. Cody.

On appeal, Roth argues that jury voir dire and the exercise of peremptory challenges are unique functions calling for counsel's active participation and specialized assessments. Roth asserts that he was entitled to "the counsel *he* [had] select[ed] to represent him".

■ The parties agree that among the components of the constitutional right to counsel is "the right to a reasonable opportunity to select and be represented by chosen counsel". *Gandy v. Alabama*, 569 F.2d 1318, 1323 (5th Cir. 1978); *see also, e.g., State v. Chase*, 59 Wn. App. 501, 506, 799 P.2d 272 (1990); *United States v. Lillie*, 989 F.2d 1054, 1055 (9th Cir. 1993); *Wilson v. Mintzes*, 761 F.2d 275, 278 (6th Cir. 1985). "It is settled law that under the Sixth Amendment criminal defendants 'who can afford to retain counsel have a qualified right to obtain counsel of their choice.' " *United States v. Washington*, 797 F.2d 1461, 1465 (9th Cir. 1986) (quoting *United States v. Ray*, 731 F.2d 1361, 1365 (9th Cir. 1984)).

■ However, the right to retained counsel of choice is not a right of the same force as other aspects of the right to counsel. *See, e.g., Birt v. Montgomery*, 725 F.2d 587, 593 & n.13 (11th Cir.) ("The right to counsel of choice, . . . unlike the right to counsel in general, is not absolute."), *cert. denied*, 469 U.S. 874 (1984). Although "under particular circumstances [a defendant] can be unlawfully deprived of the right by denial of a motion for continuance . . ., the right to retain counsel of one's own choice has limits . . .". *Chase*, 59 Wn. App. at 506. Among those limits is the principle that "[a] defendant's right to retained counsel of his choice doesn't include the right to unduly delay the proceedings." *Lillie*, 989 F.2d at 1056.

■ In general, broad discretion is granted to trial courts on motions for continuances sought to preserve the right to counsel: "only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' " violates the defendant's right. *Morris v. Slappy*, 461 U.S. 1, 11-12, 75 L. Ed. 2d 610, 103 S. Ct. 1610 (1983) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589, 11 L. Ed. 2d 921, 84 S. Ct. 841 (1964)). The trial court must balance the defendant's interest in counsel of his or her choice against the "public's interest in prompt and efficient administration of justice." *Linton v.*

*Perini*, 656 F.2d 207, 209 (6th Cir. 1981), *cert. denied*, 454 U.S. 1162 (1982).

██ Courts have articulated a host of factors for determining whether the denial of a continuance unjustifiably interferes with the right to counsel of choice. *See generally* 2 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 11.4, at 39-40 (1984). An appraisal of the following factors strongly supports the court's exercise of discretion in this case: (1) whether the court had granted previous continuances at the defendant's request; (2) whether the defendant had some legitimate cause for dissatisfaction with counsel, even though it fell short of likely incompetent representation; (3) whether available counsel is prepared to go to trial; and (4) whether the denial of the motion is likely to result in identifiable prejudice to the defendant's case of a material or substantial nature.

First, the court ordered one continuance at Roth's behest. Second, at no time did Roth articulate cause for *dissatisfaction* with cocounsel, Mr. Muenster. Roth merely claimed that he would be *more satisfied* with Mr. Cody's presence at jury selection. Although Roth claimed to have greater confidence in his longstanding relationship with Mr. Cody, the Supreme Court has emphatically rejected the notion that the constitution ensures the right to insist upon a "meaningful attorney client relationship . . .". (Italics omitted.) *Morris*, 461 U.S. at 13. Third, it is undisputed that Mr. Muenster was thoroughly prepared to go to trial, being familiar with the case and the defense theory, and that he did in fact capably represent the Defendant. Finally, at the time of the motion, there was no reasonable basis to conclude that jury selection by Mr. Muenster — an experienced and skilled defense attorney who had handled numerous murder trials — instead of by Mr. Cody would result in any identifiable prejudice to the Defendant's case.

Roth nevertheless contends that it is not necessary for him to establish actual prejudice. We agree. *See United States v. Burton*, 584 F.2d 485, 498 (D.C. Cir. 1978) (the existence of actual prejudice to the case "is not a prerequisite to a constitu-

tional violation in this context"), *cert. denied*, 439 U.S. 1069 (1979). However, while not a *necessity*, the inability of the defendant to establish likely prejudice at the motion for continuance weighs heavily in the trial court's balance of the competing considerations.

In *Burton*, one of two counsel retained by defendant withdrew on the date initially set for trial. Defendant sought a continuance for the purpose of seeking replacement counsel. The trial court denied the motion, and the Court of Appeals affirmed. In deciding that defendant had not presented a strong case for granting a continuance, the court noted that "[i]f the defendant has other competent counsel prepared to go to trial, then the court, when considering all the factors, need not tolerate as much inconvenience as in the case where defendant has no other counsel prepared to go to trial." 584 F.2d at 498 n.46.[11]

Applying the abuse of discretion standard, we hold that the trial court could reasonably have balanced the competing considerations as it did and concluded that the fair and efficient administration of justice weighed more heavily than defendant's choice of counsel.[12] It is undisputed that Roth had already received one continuance and had eminently competent counsel prepared to conduct voir dire. Under such circumstances, the trial court could reasonably decide that it

[11]We recognize that the remaining counsel in *Burton* was defendant's "lead counsel", and that the court relied heavily on this fact in reaching its decision. However, this was significant in *Burton* only because counsel's status as "lead counsel" reflected superior preparedness. Here, there is no claim that Mr. Muenster, Roth's nonlead counsel, was less prepared than Mr. Cody. *See Mitchell v. State*, 480 So. 2d 1254, 1255-57 (Ala. Crim. App.) (upholding denial of continuance until lead counsel could be present for jury selection where prior continuances granted, cocounsel had participated in pretrial proceedings and took an active role in the trial, and cocounsel performed jury selection competently), *cert. denied* (Ala. Nov. 22, 1985).

[12]Roth also challenges the trial court's failure to engage in on-the-record balancing to decide the counsel of choice issue. He cites no authority to support this argument, however. In general, outside of the ER 404(b) and ER 609 contexts, on-the-record balancing is not required because such a rule "would unnecessarily and unreasonably intrude upon the trial court's management of the trial process." *State v. Gould*, 58 Wn. App. 175, 184, 791 P.2d 569 (1990). In any event, the record in this case amply permits effective appellate review of the issue.

would not condone further delay. The trial court's decision that the prompt and efficient administration of justice outweighed Roth's right to counsel of choice cannot fairly be characterized as an unreasoning and arbitrary insistence upon expeditiousness. Therefore, we conclude that the denial of Roth's motion for a continuance did not violate his constitutional right to counsel of choice.

The panel has determined that its disposition of the remaining issues has no precedential value. Hence, the balance of this opinion will not be published, but it has been filed as a public record. *See* RCW 2.06.040.

GROSSE and BECKER, JJ., concur.

Review denied at 126 Wn.2d 1016 (1995).