IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 35402-4-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| GABRIEL M. GOMEZ, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, C.J. — Gabriel Gomez appeals his conviction for third degree child molestation. He argues: (1) the trial court erred when it admitted three different instances of ER 404(b) evidence, (2) he received ineffective assistance of counsel, (3) the prosecutor committed prosecutorial misconduct during closing argument, (4) the cumulative error doctrine warrants a new trial, (5) two community custody conditions are vague and should be struck, (6) appellate costs should not be imposed if the State is the prevailing party, and (7) his criminal filing fee and other discretionary costs should be reversed and struck. We affirm his conviction but remand for the trial court to strike the contested community custody conditions and court costs.

FACTS

*Background facts*

In 2006, Gabriel Gomez, then in his early 20s, began attending the Word of Faith Church. Soon after, he began volunteering in the church's youth programs, including overseeing children's ministry and supervising teenagers in youth ministry.

Around 2007 or 2008, N.A. began attending Word of Faith Church. At the time, she was 7 or 8 years old. It was around this time when she met Mr. Gomez in his role as a volunteer with children's ministry.

As N.A. became older, she joined the youth ministry team. As part of the youth ministry team, N.A. assisted with the media team that Mr. Gomez supervised. This is when their relationship began to change.

Mr. Gomez began commenting to N.A. how she looked when she wore a skirt or how pretty and beautiful she was. Mr. Gomez would make comments to N.A. about other girls he liked in the youth ministry, and he discussed with her a formula to determine whether two people could date if they had a significant age difference. Mr. Gomez bought N.A. a stuffed animal and developed nicknames for her such as, "little pretty," "little rabbit," and "little bunny." Report of Proceedings (RP) at 295.

2

The two of them began working even more closely in 2015 when N.A. started working in the sound room. The sound room was a close, tight space, which contained media equipment for the church. While working in the sound room, Mr. Gomez would put his hand on top of N.A.'s while she moved the computer mouse, purportedly to show her how to do something. He also would put his arms around her body to show her something on the computer.

Shortly before her 16th birthday in January 2016, N.A. was working in the sound room when Mr. Gomez came up behind her, wrapped his arms under hers, and put his palms on each of her breasts. N.A. did not tell anyone right away. She was afraid Mr. Gomez would call her a liar, everyone would look at her differently, or people would think she was a troublemaker.

Around this time, church leadership received a complaint from a church member, 18-year-old Christie Walker. Ms. Walker reported that Mr. Gomez recently had asked her out, and she wanted leadership to tell Mr. Gomez to stop texting her. Church leadership promptly asked Mr. Gomez to resign from youth ministry while it investigated. Later, leadership removed Mr. Gomez from the church.

N.A. heard that Mr. Gomez resigned from youth ministry because of Ms. Walker's complaint. She then spoke with church leadership about what Mr. Gomez recently did to her. The report prompted church leadership to contact Child Protective Services.

Detective Holly Baynes interviewed N.A. and recorded her statement. N.A. said that Mr. Gomez touched her breasts "'a little bit'" and said the touching may have been accidental. RP at 319.

The State charged Mr. Gomez with third degree child molestation. To prove its case, the State had to prove beyond a reasonable doubt that Mr. Gomez (then 32 years old) had "sexual contact" with N.A (then 15 years old). RCW 9A.44.089. "Sexual contact" means "any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party." RCW 9A.44.010(2).

*Pretrial motions to admit ER 404(b) evidence*

Before trial, the State moved to admit ER 404(b) evidence that the church had repeatedly asked Mr. Gomez to modify his behavior of hugging young people in the church. The State argued that the evidence was necessary to show absence of mistake or accident. Mr. Gomez responded that the evidence was highly prejudicial and created the impression that "because he is kind of the creepy guy at church he has got to be a child

4

molester." RP at 14. The trial court granted the State's motion, and explained, "The act of hugging an individual is not itself a criminal act . . . . [T]he risk of unfair prejudice is outweighed by probative value." RP at 14-15.

Mr. Gomez also moved to exclude ER 404(b) evidence that he attempted to date Christie Walker. The State argued that the evidence was admissible to explain why N.A. reported the molestation when she did. Mr. Gomez responded that he had no intention of making an issue over N.A.'s delay in reporting. The court commented that the State had a right to explain why N.A. spoke to church leadership and, unless a fuller version of the story was told, the jury would be unable to understand the link. The court preliminarily ruled that the evidence would come in and asked whether the evidence could be presented in a neutral way and whether a limiting instruction should be given. In response, Mr. Gomez responded that there was no evidence that what he did was a crime, and the State again was simply trying to present him as "the creepy guy at church who is molesting and grooming children when that's just simply not the case." RP at 19. Mr. Gomez suggested the State simply say, "[N.A.] came forward with an allegation and go from there." RP at 19. The trial court granted the State's motion and explained: Without the evidence, the jury would be left to "speculate erroneously as to how it is this young lady was contacted and what it was that prompted the disclosure." RP at 24.

5

*Trial*

At trial, the State elicited testimony about Mr. Gomez's conduct with teenage girls/women in the church. Koni Kincaid, a youth pastor at the church, testified that she repeatedly asked Mr. Gomez to modify his behavior around young women. She cited an incident where a college-age woman reported that she and Mr. Gomez were in the sound room, and he stood very close to her and touched her sides. This prompted Ms. Kincaid to ask Mr. Gomez to not hug minors, but instead give side hugs.

Eric Slater, the director of youth education, testified that he repeatedly asked Mr. Gomez to modify his behavior around young women and girls. "I constantly had to bring it to Koni's attention . . . that [Mr. Gomez] would go behind girls and tickle their sides." RP at 248. He also would see Mr. Gomez hovering over girls or touching their hand while they manipulated the computer mouse. He testified that he told Mr. Gomez to stop this behavior, which he described as "borderline completely inappropriate." RP at 249.

Mr. Slater testified he eventually removed Mr. Gomez from the church due to concerns about his texting and involvement with 18-year-old Ms. Walker. He explained, "[W]e felt that he used his position of leadership to persuade [sic] a relationship with someone directly involved, directly underneath him in the ministry." RP at 265 (alteration in original).

N.A. testified that she had known Mr. Gomez as a youth leader in the church for many years. She said he occasionally invaded her personal space in the media sound room by putting his arms around her or putting his hand on top of hers and moving the computer mouse.

Defense counsel objected to anticipated questions about a FaceTime call in which Mr. Gomez asked N.A. to clean his house. The State argued that the communication was relevant to prove sexual gratification, a component of sexual contact, an element of the crime. The State also argued that the communication was relevant to prove absence of accident or mistake. The State explained that the FaceTime communication occurred two to four months prior to the alleged molestation. The trial court overruled Mr. Gomez's objection and explained: "In light of the time frame involved I would find that it is res gestae. . . . Any probative value is not outweighed by unfair prejudice in light of the fact that these are the defendant's own statements close in time to the charged act." RP at 293.

N.A. then testified about the FaceTime communication. She testified that Mr. Gomez showed her the inside of his house during their FaceTime conversation and asked if she wanted to clean it. She declined.

7

After this testimony, N.A. testified about the purported molestation. N.A. testified that Mr. Gomez entered the sound room where she was typing on a computer and wrapped his arms around her and touched her breasts for 20 to 30 seconds.

Mr. Gomez cross-examined N.A. and questioned her version of events. He noted the discrepancy between her direct testimony and her statement to Detective Baynes months earlier that he had touched her a little bit and it may have been accidental. He further questioned her failure to tell Detective Baynes that the touching lasted 20 to 30 seconds.

The State closed, and Mr. Gomez unsuccessfully moved to dismiss at the close of the State's case. Mr. Gomez did not testify, but he did call Detective Baynes to testify.

During closing argument, the State emphasized Mr. Gomez's failure to modify his behavior at church:

> [Y]ou can take into consideration when you think about the sexual contact that he was asked to modify his behavior on numerous occasions by this church. Don't pick up young ladies. Don't give full front hugs. Give side hugs. Don't hover over them on the computer. Don't touch their hands while they are manipulating the mouse. He was told to modify his behavior and continued [his behavior].

RP at 357.

8

No. 35402-4-III
*State v. Gomez*

The prosecutor added: "And, you know, [Mr. Gomez] likes girls significantly younger than him. You learned that during trial. You learned that he asked out an 18-year-old Christie Walker when he was 32 years old." RP at 362. Mr. Gomez mostly argued that N.A. was not credible and that her stories were inconsistent.

The jury returned a guilty verdict for third degree child molestation. The trial court imposed a lower end standard sentence of seven months. Mr. Gomez appeals.

ANALYSIS

A.      ER 404(b) EVIDENCE

Mr. Gomez argues the trial court erred when it admitted three instances of ER 404(b) evidence. Generally, a trial court's evidentiary rulings are reviewed for an abuse of discretion. *State v. McDonald*, 138 Wn.2d 680, 693, 981 P.2d 443 (1999). "An abuse of discretion occurs only when the decision of the court is 'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" *State v. McCormick*, 166 Wn.2d 689, 706, 213 P.3d 32 (2009) (quoting *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)).

### 1. *Requests to not hug girls/young women at church*

Mr. Gomez argues the trial court erred in permitting ER 404(b) evidence that he was repeatedly told not to hug girls/young women at church. Mr. Gomez asserts that the evidence was improperly allowed to rebut a nonexistent defense of mistake or accident.

The State agrees that evidence offered to rebut accident or mistake is irrelevant until a claim of accident or mistake is made by a defendant. The State argues that Mr. Gomez sufficiently interjected the defense of accident into the case to make the evidence admissible. We agree.

"[A] material issue of accident arises where the defense is denial and the defendant affirmatively asserts that the victim's injuries occurred by happenstance or misfortune." *State v. Roth*, 75 Wn. App. 808, 819, 881 P.2d 268 (1994). As explained below, although Mr. Gomez asserted a general denial defense, he also tried to convince the jury that his touching of N.A.'s breasts was accidental and misconstrued.

During voir dire, defense counsel attempted to examine jurors on the issue of "accidental touchings that happen in our society." RP at 193. Later, during opening, defense counsel implied that the touching was misconstrued and declared "[t]his case is blown out of proportion." RP at 231. Defense counsel cross-examined N.A. about her telling the detective that the touching of her breasts might have been accidental. Defense

10

counsel questioned Detective Baynes, and repeatedly asked her whether "she thought [the touching of N.A.'s breasts] might have been an accident." RP at 319. Mr. Gomez's true defense was not general denial. That is, he did not argue he never touched N.A.'s breasts. Rather, his true defense was that the touching of N.A.'s breasts was accidental and misconstrued.

### 2. *Asking out 18-year-old Ms. Walker*

Mr. Gomez argues the trial court erred in admitting evidence that he asked out 18-year-old Ms. Walker. At the time, Ms. Walker was only two years older than N.A.

The trial court ruled that the State would be permitted to have N.A. explain the timing of her disclosure coincided with her learning that Mr. Gomez had been removed from youth ministries because he asked out Ms. Walker. The trial court asked how the evidence could be presented neutrally and possibly with a limiting instruction. But this was not how the evidence came to the jury.

Instead, during Mr. Gomez's cross-examination of Mr. Slater, he asked whether Mr. Slater had misinformed a church member of why Mr. Gomez was removed from youth ministries. Mr. Slater admitted that he had misinformed a church member. This question and answer left the jury with the false inference that Mr. Slater was biased against Mr. Gomez.

11

On redirect, the prosecution may clear up confusion from cross-examination, rehabilitate the witness, or otherwise rebut the testimony on cross-examination. *State v. Mack*, 80 Wn.2d 19, 21, 490 P.2d 1303 (1971). To remove the false inference Mr. Gomez created, the State asked Mr. Slater the true reason why Mr. Gomez was removed from youth ministries. Mr. Slater answered that Mr. Gomez was removed because Ms. Walker, then 18, had complained that Mr. Gomez had asked her out. Mr. Slater further explained that he had lied to the church member to protect Mr. Gomez from embarrassment.

Whether the court's pretrial ruling was correct is not properly before us. The ruling did not cause the evidence at issue to be admitted. Rather, Mr. Gomez's cross-examination of Mr. Slater caused the ruling to be admitted. Mr. Gomez does not contend the trial court erred in allowing the evidence during Mr. Slater's redirect.

### 3. *FaceTime communication*

Mr. Gomez argues the trial court erred by admitting the FaceTime conversation between him and N.A. in which he asked if she wanted to clean his house. Mr. Gomez argues the testimony was highly prejudicial and lacked any relevance. The State did not respond to this argument. We agree with Mr. Gomez.

The trial court admitted the testimony as res gestae. Courts have recognized a "res gestae" or "same transaction" exception to ER 404(b) "in which 'evidence of other crimes is admissible '[t]o complete the story of the crime on trial by proving its immediate context of happenings near in time and place.'" *State v. Lane*, 125 Wn.2d 825, 831, 889 P.2d 929 (1995) (alteration in original) (quoting *State v. Tharp*, 27 Wn. App. 198, 204, 616 P.2d 693 (1980), *aff'd*, 96 Wn.2d 591, 637 P.2d 961 (1981)). "[E]vidence of other crimes or misconduct is admissible to complete the story of the crime" and "'in order that a complete picture be depicted for the jury.'" *State v. Brown*, 132 Wn.2d 529, 571, 940 P.2d 546 (1997) (quoting *Tharp*, 96 Wn.2d at 594).

The FaceTime conversation occurred two to four months prior to the purported molestation. We have found no case extending the res gestae rule to similar remote-in-time events. We conclude the trial court erred in admitting the FaceTime conversation under the res gestae rule.

Evidentiary errors under ER 404(b) are not of constitutional magnitude. *State v. Jackson*, 102 Wn.2d 689, 695, 689 P.2d 76 (1984). Such errors do not require reversal of a criminal conviction unless, within reasonable probabilities, the outcome of the trial would have been different had the error not occurred. *Id.*

13

The outcome of the trial depended on the State persuading jurors that Mr. Gomez's touching of N.A.'s breasts was not accidental, but instead, was done for purposes of sexual gratification. Although the FaceTime conversation was a piece of the puzzle, there were several other pieces. These pieces include: (1) Mr. Gomez commenting how N.A. looked in a skirt and how pretty she was, (2) Mr. Gomez talking with N.A. about a formula to determine whether a girl is not too young to date, (3) Mr. Gomez buying N.A. a stuffed animal and calling her pet names, (4) Mr. Gomez, then 32 years of age, asking out an 18-year-old woman, (5) Mr. Gomez often touching teenage girls on their hands, tickling their sides, and being unable or unwilling to stop this sort of behavior. In light of all of this other proper evidence, we cannot conclude the erroneous admission of the FaceTime conversation changed the outcome of the trial.

B.    INEFFECTIVE ASSISTANCE OF COUNSEL

Mr. Gomez argues he received ineffective assistance of counsel when his attorney failed to request a limiting instruction advising the jury of the limited purpose for which it may consider the ER 404(b) evidence, i.e., to show whether Mr. Gomez touched N.A.'s breasts for his or her sexual gratification.

To protect a defendant's right to counsel, a defendant has the right to receive effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). An allegation of ineffective assistance of counsel is a mixed question of law and fact that we review de novo. *Id.* at 698. To determine whether counsel provided effective assistance, we apply a two-pronged test: (1) whether counsel's performance was deficient, and (2) whether that deficient performance prejudiced the defendant to an extent that changed the result of the trial. *Id.* at 687.

To determine whether counsel's performance was deficient, the defendant has the burden to show that counsel's performance fell below an objective standard of reasonableness. *State v. McFarland*, 127 Wn.2d 322, 332-35, 899 P.2d 1251 (1995). There is a strong presumption that counsel performed sufficiently and effectively. *Strickland*, 466 U.S. at 689. Counsel's deficient performance cannot be tied to a reasonable trial strategy or tactic. *State v. Garrett*, 124 Wn.2d 504, 520, 881 P.2d 185 (1994). However, the presumption that counsel performed effectively can be overcome if the defendant shows there is no conceivable legitimate tactic explaining counsel's performance. *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004).

Here, Mr. Gomez's challenge fails on the first prong. After both sides had rested, the trial court discussed the possibility of a limiting instruction with Mr. Gomez. The trial

15

court gave Mr. Gomez time to discuss it with counsel. In the end, it was a trial strategy for Mr. Gomez to forego a limiting instruction because he did not want to draw attention to the evidence that was supposed to be disregarded. Specifically, he stated:

> [Defense counsel]: Your Honor, we have discussed and in a brief summary of my client's feelings, they are the same feelings as mine; that when you sit there and tell somebody not to pay attention to it on a jury they might then say, well, why aren't I supposed to pay attention to this and give any weight to it and actually start thinking about it more than they shouldn't be. So that's my feeling on limiting instructions. If I can avoid them at all costs I do and my client is in agreement.
> THE COURT: All right. Mr. Gomez, is what [your attorney] just said correct; that he has spoken with you regarding this tactical decision in the case and you feel you have had enough time to talk with him about it?
> MR GOMEZ: Correct.
> THE COURT: All right. And you understand the basis for the decision and, in fact, you agree with him. Is that—
> MR. GOMEZ: Yes.

RP at 339. Mr. Gomez's decision to forego a limiting instruction was a legitimate trial strategy or tactic, and he has failed to show otherwise.

Mr. Gomez also argues he received ineffective assistance of counsel because his attorney failed to obtain a pretrial order limiting "needlessly repetitive misconduct evidence" to infer guilt. Appellant's Br. at 26. Mr. Gomez argues, without such an order, "the [S]tate introduced an avalanche of repetitive and damaging evidence that far exceeded the basis for its admission." Appellant's Br. at 28. Mr. Gomez further argues that such an order would have been granted because the court expressed a desire for

16

"structuring [the ER 404(b) evidence] in some way to attempt to remove potential prejudice or limiting instruction making clear that this is not illegal conduct." RP at 24. We disagree with this last point.

To show prejudice for counsel's failure to make a motion, a defendant must show the motion likely would have been granted. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 711, 101 P.3d 1 (2004). Although the record shows the trial court was willing to admit the ER 404(b) evidence in a neutral manner to lessen its prejudice, not once did the trial court imply that any ER 404(b) evidence would *not* come in. Mr. Gomez's argument that an order in limine would have kept some repetitive evidence out is pure speculation.

Although the repetitive ER 404(b) evidence was powerful, it was powerful because it provided persuasive evidence on the central issue: whether Mr. Gomez's touching of N.A. was done for sexual gratification or whether it was accidental and misconstrued. The repetitive directives from church leadership to Mr. Gomez to not touch teenage girls and Mr. Gomez's repetitive choice to disregard those directives were powerful evidence that he intentionally and inappropriately touched N.A.'s breasts.

C. PROSECUTORIAL MISCONDUCT IN CLOSING

Mr. Gomez argues that the State committed misconduct by stating Mr. Gomez likes women "significantly younger than him" during its closing argument. Allegations

of prosecutorial misconduct during closing argument are reviewed "in light of the entire argument, the issues in the case, the evidence discussed during closing argument, and the court's instructions." *State v. Rodriguez-Perez*, 1 Wn. App. 2d 448, 458, 406 P.3d 658 (2017), *review denied*, 190 Wn.2d 1013, 415 P.3d 1189 (2018). Mr. Gomez bears the burden to show the prosecutor's conduct was improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). "If the defendant did not object at trial, the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Id.* at 760-61. Prosecutors have wide latitude in closing arguments to draw reasonable inferences from the evidence at trial and to express those inferences to the jury. *State v. Stenson*, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997).

Here, Mr. Gomez did not object to the statement in closing argument. The prosecutor's statement that Mr. Gomez likes women "significantly younger than him" may raise an eyebrow, on its own, but in context it is not the kind of flagrant, ill intentioned statement that warrants reversal. The prosecutor explained that the evidence showed Mr. Gomez was 32 years old and asked out an 18-year-old member of the church in which he had a position of authority over her. The prosecutor stated that this was not illegal, but the church took issue with it. The prosecutor then revisited the evidence that

18

showed Mr. Gomez's intentions with N.A.: Mr. Gomez made comments to N.A. about how she looked in a skirt, he said she was pretty, he bought her a stuffed animal, he had pet names for her, he often touched her sides or her hand, and he called her using FaceTime and asked her if she wanted to clean his house. The prosecutor also revisited the evidence that showed Mr. Gomez's intention with girls/young women in general. He told N.A. other girls in youth ministry that he liked, they discussed appropriate dating age ranges, and he asked out an 18-year-old woman. The discussions between Mr. Gomez and N.A. helped to explain the nature of Mr. Gomez's interest in N.A. And an 18-year-old woman is significantly younger than a 32-year-old man. In light of the entire argument, the issues in the case, and the evidence that came in at trial, it was not flagrant or ill intentioned for the prosecutor to argue that Mr. Gomez likes women "significantly younger than him." The prosecutor is allowed to draw reasonable inferences from the evidence at trial and to express those to the jury.

D.    CUMULATIVE ERROR DOCTRINE

Cumulative error claims are constitutional issues, which the court reviews de novo. *State v. Clark*, 187 Wn.2d 641, 649, 389 P.3d 462 (2017). In order to receive relief based on the cumulative error doctrine, "the defendant must show that while multiple trial errors, 'standing alone, might not be of sufficient gravity to constitute grounds for a new

trial, the combined effect of the accumulation of errors most certainly requires a new trial.'" *Id.* (quoting *State v. Coe*, 101 Wn.2d 772, 789, 684 P.2d 668 (1984)). Cumulative error does not apply where there are no errors or the errors are few and have little or no effect on the trial's outcome. *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). Because there was only one evidentiary error, the cumulative error doctrine does not apply.

E.    COMMUNITY CUSTODY CONDITIONS

Mr. Gomez challenges the community custody condition that prohibits him from having contact with minor males and the condition that prohibits him from engaging in a romantic relationship without prior approval of his community custody officer (CCO). The State properly concedes these arguments. The first challenged condition is not crime related. The second challenged condition is unconstitutionally vague.[1]

---

[1] *See State v. Dickerson*, 194 Wn. App. 1014, 2016 WL 3126480, at *5 (community custody condition requiring CCO prior approval of any "romantic relationship" unconstitutionally vague). *But see State v. Nguyen*, 191 Wn.2d 671, 681-83, 425 P.3d 847 (2018) (community custody condition requiring CCO prior approval of any "dating relationship" not unconstitutionally vague, partly because the phrase is defined by

F.      APPELLATE COSTS

Mr. Gomez requests that we deny the State an award of appellate costs in the event

the State substantially prevails.  We deem the State the substantially prevailing party.  The

State has conceded this issue and does not request costs.

G.      FILING FEE AND DISCRETIONARY LEGAL FINANCIAL OBLIGATIONS (LFOS)

Mr. Gomez asserts the $200 criminal filing fee and the $250 jury demand fee

should be struck.  House Bill 1783, which became effective June 7, 2018, prohibits trial

courts from imposing discretionary LFOs on defendants who are indigent at the time of

sentencing.  LAWS OF 2018, ch. 269, § 6(3); *State v. Ramirez*, 191 Wn.2d 732, 745-46,

426 P.3d 714 (2018).  This change to the criminal filing fee statute is now codified in

RCW 36.18.020(2)(h).  As held in *Ramirez*, these changes to the criminal filing fee

statute apply prospectively to cases pending on direct appeal prior to June 7, 2018.

*Ramirez*, 191 Wn.2d at 747.  Accordingly, the change in law applies to Mr. Gomez's

case.  Because Mr. Gomez was indigent in the trial court and still indigent on appeal, the

$200 criminal filing fee should be struck pursuant to *Ramirez*.

Also, the $250 jury demand fee is a discretionary cost.  RCW 10.01.160(2).  As

such, the fee falls under the *Ramirez* umbrella and should be struck.

---

RCW 26.50.010(2)).

No. 35402-4-III
*State v. Gomez*

Affirmed, but remanded to strike two community custody conditions and two court costs.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, C.J.

WE CONCUR:

Korsmo, J.

Siddoway, J.